DONALD R. HESSLER, Plaintiff-Appellee, v. CRYSTAL LAKE CHRYSLER-PLYMOUTH, INC., Defendant-Appellant.

Second District No. 2—02—0362

Opinion filed April 15, 2003.

James A. Campion, R. Mark Gummerson, and Lori E. Fulton, all of Campion, Curran, Rausch, Gummerson & Dunlop, P.C., of Crystal Lake, for appellant.

Joseph Gottemoller, of Madsen, Sugden & Gottemoller, of Crystal Lake, for appellee.

JUSTICE CALLUM delivered the opinion of the court:

Plaintiff, Donald R. Hessler, sued defendant, Crystal Lake Chrysler-Plymouth, Inc., for breach of contract. Following a bench trial, the court entered judgment for plaintiff and awarded him $29,853 in damages. Defendant appeals, arguing that the trial court erred in (1) concluding that a certain term was part of the contract; (2) interpreting the term; (3) finding that defendant breached the contract; and (4) calculating the damages award. We affirm.

## I. BACKGROUND

In February 1997, Chrysler Corporation introduced a new promotional vehicle called the Plymouth Prowler. However, the company did not reveal whether it would manufacture any of the vehicles. Plaintiff became aware of the vehicle and of its uncertain production, and, on February 4, 1997, contacted several dealerships to inquire about purchasing a Prowler.

On February 5, 1997, plaintiff met with Gary Rosenberg, co-owner of defendant dealership and signed a "Retail Order for a Motor Vehicle" (hereinafter Agreement). The Agreement, which was filled out primarily by Rosenberg, stated that the order was for a 1997, V6, two-door, purple Plymouth Prowler. Moreover, it read:

"Customer to pay $5,000 00/100 over list price by manufacturer. Money refundable if cannot [deliver] by 12/30/97. Dealer to keep car 2 weeks."

The Agreement also contained a preprinted integration clause, which read as follows:

"Purchaser agrees that this Order includes all the terms and conditions of [sic] both the face and reverse side hereof, that this Order cancels and supersedes any prior agreement and as of the date hereof comprises the complete and exclusive statement of the terms of the agreement relating to the subject matters covered hereby, and that *THIS ORDER SHALL NOT BECOME BINDING UNTIL ACCEPTED BY DEALER OR HIS AUTHORIZED REPRESENTA-TIVE*. Purchaser by his execution of this Order acknowledge[s] that he has read its terms and conditions and has received a true copy of this Order." (Emphasis in original.)

The order also noted that plaintiff had deposited $5,000 by check.

The Agreement contained a box labeled "TO BE DELIVERED ON OR ABOUT." Inside the box was written "ASAP" in a handwriting and ink different from that in the rest of the document. Rosenberg testified that he did not write "ASAP" on plaintiff's order himself. Rather, a salesperson wrote it in the process of "finishing up" the transaction. Rosenberg did not instruct the person to do so, but he routinely delegates to defendant's employees the processing of

customer checks and the dispensing of receipts. Rosenberg stated that the term "ASAP" is used in his business "in lieu of a stock number. Just line it up in order. As soon as you can get it done, do it." He also testified that "[i]n the literary form" it means as soon as possible. The Agreement contains another box labeled "STOCK NO.," which was left blank.

Rosenberg testified that plaintiff was the first person to place an order for a Prowler. Further, Rosenberg was "pretty sure" that plaintiff's order was the first order on which he received a deposit.

Plaintiff testified that he requested that Rosenberg insert language into the order that provided that plaintiff's money would be returned if no car was ultimately delivered to defendant. He did not ask Rosenberg to insert language specifying that plaintiff would receive the first Prowler, but he assumed that he would receive the first one.

The Agreement contains handwritten initials. Plaintiff testified that, while an employee at the dealership was processing his receipt, plaintiff noticed that the contract had not been signed by the dealership and he thus requested that Rosenberg sign it. The employee, instead, signed the contract in plaintiff's presence. Rosenberg, however, testified that he initialed the Agreement.

### A. May 11 Conversation

Plaintiff testified that his next contact with Rosenberg was on May 11, 1997, when he called Rosenberg to discuss the Prowler's list price. They agreed that the information they had received was that the manufacturer's list price would be $39,000.

### B. Palandri's Contract

On May 23, 1997, Salvatore Palandri entered into a contract with defendant to purchase a 1997 Plymouth Prowler. His contract reflects a purchase price of "50,000 + tax + lic + doc" and a $10,000 deposit. It further states that Palandri would receive the "first one delivered to [the] dealership." Palandri testified that he wrote a check for his deposit on the same day that he entered into the contract. Palandri stated that his initial discussions with Rosenberg about the Prowler, however, occurred about one to three months before the contract date.

### C. August 11 Conversation

Plaintiff testified that the next conversation that the parties had occurred on August 11, 1997. Plaintiff stated that Rosenberg informed plaintiff that no Prowlers would be delivered to the Midwest and that he would be returning plaintiff's check. Plaintiff requested assurance that, should defendant receive a vehicle, it would be his. Rosenberg said that it would. Plaintiff then requested assurance in writing, and

Rosenberg stated that he would check with his brother. He also indicated that he was not certain that plaintiff was the first person who had a contract for a Prowler.

Rosenberg testified about this conversation as follows. Plaintiff inquired whether defendant would receive any cars and he replied that he had "no guarantees at this time." Rosenberg never understood that no Prowlers would be delivered to the Midwest. The conversation consisted of nothing more than this discussion. Rosenberg denied having stated whether the car belonged to plaintiff or that he would have to check with his brother.

Plaintiff testified that he called several dealers to check on the availability of Prowlers. He believed that he was the first customer to place an order for a Prowler because plaintiff and Rosenberg had to discuss the potential list price for the vehicle.

### D. September 5 Conversation

Plaintiff testified that he called Rosenberg on September 5 to inquire if Rosenberg had received any additional information about the Prowler. Rosenberg indicated that he had not. Plaintiff then asked for confirmation that if defendant received a car it would be allocated to plaintiff, and Rosenberg stated that it would. Plaintiff stated that Rosenberg did not mention a contract with Palandri.

### E. September 19 Trip

Plaintiff next testified that he attended a Chrysler customer appreciation event at Great America on September 19 and spoke to a company representative about the Prowler. Two days later, the representative sent him a fax that contained a tentative list of dealers who were to receive Prowlers. Defendant's name was on the list.

### F. September 22 Conversation

Plaintiff testified that he called Rosenberg on September 22 to notify him that his dealership was on a list of dealers due to receive Prowlers. Rosenberg informed plaintiff that he would not sell plaintiff a car because plaintiff had gone behind Rosenberg's back and that contacting Chrysler would cause Rosenberg problems. Rosenberg also stated that plaintiff was not the first person with whom he contracted to sell a Prowler. Plaintiff protested and Rosenberg informed him that he did not sign the contract and would not sell plaintiff the car. Based on this and previous conversations with Rosenberg, plaintiff did not believe that he would be able to purchase a Prowler from defendant.

Rosenberg testified that he had a conversation at this time with plaintiff about the Great America show and that he told plaintiff that he was "pretty sure," given the dealership's sales, that it would receive

at least one car. When plaintiff requested confirmation that it would be his car, Rosenberg told him that the car was already "committed."

## G. Plaintiff's Purchase of a Prowler

Beginning on September 23, 1997, plaintiff contacted 38 Chrysler-Plymouth dealerships to inquire about purchasing a 1997 Prowler, but did not obtain one. Plaintiff had "serious doubts" about whether Rosenberg would deliver to him a Prowler.

On October 24, 1997, plaintiff attended a Prowler coming-out party at the Hard Rock Café and saw a purple Prowler in the parking lot with a sign in its window that had defendant's name written on it. On October 25, plaintiff went to defendant's showroom and saw a Prowler parked there. He found Rosenberg and informed him that he was there to pick up his car. Rosenberg stated that he was not going to sell plaintiff the car and that he did not want to do business with him. Later that day, plaintiff purchased a Prowler from another dealer for $77,706.

On October 27, 1997, defendant sold the only Prowler it received in that year to Palandri for a total sale price of $54,859, including his $10,000 deposit.

## H. Plaintiff's Suit

In November 1997, plaintiff directed his attorney to send defendant a demand letter to purchase a Prowler. Plaintiff testified that he was prepared to purchase a vehicle from defendant even though he had already purchased one elsewhere. Plaintiff continued to research prices for Prowlers and, by January 1998, had not seen a price lower than the $77,706 he had paid for his vehicle. On January 7, 1998, plaintiff received his $5,000 deposit back from defendant.

On April 23, 1998, plaintiff sued defendant for breach of contract. Defendant moved to dismiss plaintiff's complaint (735 ILCS 5/2—619.1 (West 1998)), and the motion was granted. Plaintiff appealed, and this court reversed and remanded the cause for an evidentiary hearing to determine the meaning of the contract (*Hessler v. Crystal Lake Chrysler Plymouth, Inc.*, No. 2—98—1367 (1999) (unpublished order under Supreme Court Rule 23)). This court found the contract ambiguous and further found that plaintiff could prove a set of facts to show that defendant breached the contract.

Following a bench trial, the court entered judgment for plaintiff and awarded him $29,853 in damages. It concluded that defendant breached the Agreement and that plaintiff properly covered by purchasing a replacement vehicle for $29,853 more than the contract price. Further, the court found that the term "ASAP" "is not want of meaning"; that Rosenberg testified that it means "if and when a car is

delivered" and "as soon as something can be done[,] do it." The court found credible plaintiff's description of at least two conversations with Rosenberg, during which Rosenberg confirmed that, if defendant took delivery of a purple Prowler, it would be sold to plaintiff. It concluded that delivery of a Prowler was to be as soon as possible and that defendant was on the road to repudiating the contract when it entered into a contract with Palandri in May 1997. The trial court also concluded that defendant repudiated its contract in September and October of 1997 when Rosenberg told plaintiff that he would not sell him a car. It found plaintiff "ready, willing, and able to perform the contract." The court found that the price plaintiff paid for the car at another dealership was the best price he could receive for a Prowler after Rosenberg's refusal to sell to him a car.

## II. ANALYSIS

### A. Inclusion of The Term "ASAP" in the Contract

We must first determine whether the trial court correctly included the term "ASAP" in the Agreement. Defendant argues that the term was written in the Agreement by a salesperson after Rosenberg and plaintiff negotiated the contract and after plaintiff signed the contract. Thus, defendant contends that the term "ASAP" was not a part of the parties' final expression of their agreement.

■ Construction of a contract is a question of law, which we review *de novo. Molter Corp. v. Amwest Surety Insurance Co.*, 267 Ill. App. 3d 718, 721 (1994). This transaction involves the sale of goods and thus is governed by the Uniform Commercial Code—Sales (UCC) (810 ILCS 5/2—101 *et seq.* (West 2000)).

■ Section 2—207(1) of the UCC provides:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." 810 ILCS 5/2—207(1) (West 2000).

Comment 1 to section 2—207 provides, in relevant part:

"This section is intended to deal with two typical situations. The one is the written confirmation, where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon *and adding terms not discussed*. The other situation is offer and acceptance, in which a wire or letter expressed and intended as an acceptance or the closing of an agreement adds further minor suggestions or

proposals such as 'ship by Tuesday,' 'rush,' 'ship draft against bill of lading inspection allowed,' or the like." (Emphasis added.) 810 ILCS Ann. 5/2—207, Comment, at 117 (Smith-Hurd 1993).

Comment 6 to section 2—207 provides, in relevant part:

"If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to." 810 ILCS Ann. 5/2—207, Comment, at 118 (Smith-Hurd 1993).

■ Defendant argues that "ASAP" was not a term on which the parties agreed. It was written in different ink on the contract and by a salesperson who was not involved in the negotiations with plaintiff, both facts that plaintiff himself acknowledged at trial. Defendant suggests that, because the Prowler's production was uncertain, the parties purposely inserted no delivery date into the Agreement. Thus, "ASAP" was not part of the parties' final expression of their agreement. We disagree.

Rosenberg testified that the term "ASAP" was written on the contract by a salesperson in the process of "finishing up" the transaction. He also testified that he routinely delegated certain tasks in the course of his business dealings. Defendant does not argue that the salesperson had no authority to insert the term into the contract on behalf of defendant or that the insertion was a mistake. We note that defendant's own preprinted integration clause provides that the contract shall not be binding until defendant or its "authorized representative" accepts it. We also note that defendant's agents never attempted to modify the Agreement after its execution to delete the term. Although the term was not discussed by the parties, we conclude that, because the term was written contemporaneously with the execution of the contract by defendant's authorized agent, and because neither party ever protested its inclusion in the Agreement, the term constituted part of the contract. See 810 ILCS 5/2—207(1) (West 2000).

## B. Admission of Extrinsic Evidence

Having concluded that the term "ASAP" is part of the Agreement, we must next determine whether the trial court erred in interpreting the term. As this issue involves the construction of a contract, our review is *de novo. Molter Corp.*, 267 Ill. App. 3d at 721.

Assuming that the term "ASAP" is part of the Agreement, defendant asserts that it was a meaningless insertion and that the court erred by improperly considering extrinsic evidence to interpret the term to mean that plaintiff was entitled to the first Prowler. Defendant contends that the Agreement is unambiguous and that the court erred, first, in admitting parol evidence and, second, in admitting evidence that contradicted the explicit language in the Agree-

ment. Defendant further argues that, even if the extrinsic evidence is consistent with the language in the contract, the trial court erred in considering it because the contract was completely integrated and even consistent statements cannot be considered in interpreting an integrated document.

■ The basic notion of the parol evidence rule is that a writing intended by the parties to be a final expression of their agreement may not be contradicted by certain kinds of evidence. J. Calamari & J. Perillo, Contracts § 3—2, at 135-36 (3d ed. 1987).

Section 2—202 of the UCC recites the statute's parol evidence rule:

> "§ 2—202. Final Written Expression: Parol or Extrinsic Evidence. Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (Section 1—205) or by course of performance (Section 2—208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." 810 ILCS 5/2—202 (West 2000).

Comment 1 of section 2—202 provides, in relevant part:

> "This section definitely *rejects*:
>
> (a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon;
>
> ***
>
> (c) The requirement that a condition precedent to the admissibility of the type of evidence specified in paragraph (a) is an original determination by the court that the language used is ambiguous." (Emphasis added.) 810 ILCS Ann. 5/2—202, Comment, at 95 (Smith-Hurd 1993).

Thus, under the UCC's parol evidence rule, evidence of prior agreements or contemporaneous oral agreements is generally inadmissible to vary or contradict the terms of an integrated written contract. 810 ILCS 5/2—202 (West 2000); *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 521 (2001).

■ The threshold question for the application of the parol evidence rule is whether a writing is integrated. *Eichengreen*, 325 Ill. App. 3d at 524. The determination of whether a contract is completely integrated is a question of law. 810 ILCS Ann. 5/2—202, Comment, at 96 (Smith-Hurd 1993).

A contract is integrated if the parties intended it to be a final and complete expression of their agreement. *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 246 Ill. App. 3d 523, 528 (1993), *aff'd*, 162 Ill. 2d 265 (1994). The UCC rejects the presumption that a written contract sets forth the parties' entire agreement. See 810 ILCS Ann. 5/2—202, Comment, at 95 (Smith-Hurd 1993); see also *J&B Steel Contractors, Inc.*, 162 Ill. 2d at 271-72 (the UCC adopts the liberal approach favoring the admission of extrinsic evidence to determine the integration question). In this inquiry, the focus is on the intent of the parties, and the factors to be considered include: merger or integration clauses, disclaimer clauses, prior negotiations, any alleged extrinsic terms, and the sophistication of the parties. *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1132-33 (7th Cir. 1994).

Defendant argues that the contract constitutes the parties' full expression of their agreement: the Agreement was for a 1997 Prowler to be purchased at $5,000 over the manufacturer's list price; and the order was to be cancelled, and plaintiff's deposit returned, if a vehicle was not delivered to plaintiff by December 30, 1997. Assuming that it was a part of the contract, the term "ASAP" was a meaningless insertion. Further, the contract contained an explicit integration clause that states that the purchaser—plaintiff—agrees that the order comprises the complete and exclusive statement of the parties' agreement. Thus, defendant concludes that the Agreement is completely integrated and even consistent additional terms that are not included in the writing may not be introduced. See 810 ILCS 5/2—202(b) (West 2000).

We agree with defendant that the Agreement is completely integrated and constitutes a final expression of the parties' intent. The Agreement contains an integration clause, and neither party argues that the clause is void. Moreover, the fact that the integration clause is preprinted and was not specifically negotiated, without more, does not automatically render it inoperative. *Betaco*, 32 F.3d at 1133-34. Another factor tending toward a conclusion that the Agreement is completely integrated is that both parties here appear to have been very knowledgeable about promotional vehicles. Both were aware of the limited production of the Prowler and both were willing to enter into a contract before receiving confirmation of the vehicle's production and pricing.

Although we do not quarrel with defendant's assertion that the Agreement is completely integrated, we do not agree with defendant's contention that extrinsic evidence may not be used to interpret the contract. Application of the parol evidence rule determines only which terms are contained in the parties' final agreement. 810 ILCS 5/2—

207 (West 2000). It does not preclude the admission of extrinsic evidence to interpret those terms. See *McMahon Food Corp. v. Burger Dairy Co.*, 103 F.3d 1307, 1314 (7th Cir. 1996) (recognizing that, in cases in which the UCC governs, Illinois law does not require a finding of ambiguity as a condition for the admission of extrinsic evidence to "determine whether an agreement is completely or partially integrated, and to explain the meaning of even a fully integrated agreement"); see also Restatement (Second) of Contracts § 213, Comment *a* (1981) (parol evidence rule is not "a rule of interpretation; it defines the subject matter of interpretation"); E. Farnsworth, Contracts § 7.12, at 522-23 (2d ed. 1990); 3 A. Corbin, Corbin On Contracts § 579, at 412-13 (rev. ed. 1960) ("The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony").

■ This court previously found the Agreement ambiguous, and we are bound by that finding. See, *e.g., Aardvark Art, Inc. v Lehigh/Steck-Warlick, Inc.*, 284 Ill. App. 3d 627, 633 (1996) (the law of the case doctrine provides that a question of law decided on a previous appeal is binding on the trial court on remand as well as the appellate court on a subsequent appeal). We stated that it was not clear if defendant was obligated to deliver to plaintiff the first Prowler. Where a contract term is ambiguous, a court may consider extrinsic evidence to interpret the term. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d, 457, 462-63 (1999).

The trial court found that the term "ASAP" is used by most people during the course of their lives, and it pointed to Rosenberg's testimony that the term meant "if and when a car is delivered" and "as soon as something can be done[,] do it." All of the foregoing evidence confirmed that the commonly recognized meaning of the term was that which was intended in the contract. Plaintiff's testimony about his subjective beliefs and about Rosenberg's telephone assurances are consistent with this conclusion. We therefore conclude that the trial court did not err in interpreting the term "ASAP."

### C. Judgment for Plaintiff

Defendant next argues that the trial court erred in: (1) finding that defendant repudiated the contract; (2) finding that defendant breached the Agreement; (3) calculating the damages award; and (4) determining that plaintiff effected a proper cover.

■ The trial court's determination of whether a party breached a contract will not be disturbed unless it is against the manifest weight of the evidence. *Shields Pork Plus, Inc. v. Swiss Valley AG Service*, 329 Ill. App. 3d 305, 315 (2002). The trial judge, as trier of fact, is in a position superior to a court of review to observe the witnesses while testifying, to judge their credibility, and to determine the weight that their testimony should receive. Thus, where the testimony is conflicting in a bench trial, the court's findings will not be disturbed unless they are against the manifest weight of the evidence. *Neibert v. Schwenn Agri-Production Corp.*, 219 Ill. App. 3d 188, 190-91 (1991).

### 1. *Repudiation*

Defendant argues that the trial court erred in finding that defendant repudiated the Agreement. First, defendant takes issue with the trial court's finding that defendant was "on its way" to repudiating the Agreement when it contracted with Palandri in May 1997 to deliver to him the first Prowler. Defendant asserts that the court's reasoning was flawed because, in May, defendant did not know whether any Prowlers would be produced in that year. Thus, defendant could not have been on the road to repudiating the Agreement. Second, defendant contends that the court's finding that it repudiated the contract in September and October of 1997 also was error because it relied on plaintiff's contradictory, and therefore incredible, testimony. Defendant points to plaintiff's testimony that he had doubts that defendant would deliver to him a vehicle and to plaintiff's testimony that he was willing to purchase more than one Prowler.

■ Under the UCC, certain actions by a party to a contract may constitute an anticipatory repudiation of the contract if the actions are sufficiently clear manifestations of an intent not to perform under the contract. See 810 ILCS 5/2—610 (West 2000); *P.R.S. International, Inc. v Shred Pax Corp.*, 184 Ill. 2d 224, 243 (1998).

Section 2—610 of the UCC provides:

"§ 2—610. Anticipatory Repudiation. When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

(a) for a commercially reasonable time await performance by the repudiating party; or

(b) resort to any remedy for breach (Section 2—703 or Section 2—711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's

right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2—704)." 810 ILCS 5/2—610 (West 2000).

Comment 1 to section 2—610 provides, in relevant part:

"[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.

*** [W]hen such a repudiation substantially impairs the value of the contract, the aggrieved party may at any time resort to his remedies for breach ***." 810 ILCS Ann. 5/2—610, Comment, at 390 (Smith-Hurd 1993).

Comment 2 to section 2—610 provides, in relevant part:

"It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." 810 ILCS Ann. 5/2—610, Comment, at 390 (Smith-Hurd 1993)

Comment 4 to section 2—610 provides, in relevant part:

"After repudiation, the aggrieved party may immediately resort to any remedy he chooses provided he moves in good faith (see Section 1—203)." 810 ILCS Ann. 5/2—610, Comment, at 390 (Smith-Hurd 1993).

As the comments to section 2—610 illustrate, repudiation can result from an action which "reasonably indicates" that the party will not perform its contractual obligation. 810 ILCS Ann. 5/2—610, Comment, at 390 (Smith-Hurd 1993).

Upon learning that defendant was on a tentative list to receive a Prowler, plaintiff testified that he called Rosenberg to relate the information and that Rosenberg responded that plaintiff was not the first person to contract to purchase a Prowler. Rosenberg also stated that he would not do business with plaintiff. Further, Rosenberg's testimony about this conversation corroborated plaintiff's, in that Rosenberg stated that he told plaintiff that the vehicle was already "committed." The trial court also heard both plaintiff and Rosenberg testify that, when plaintiff went to defendant's showroom on October 25 and informed Rosenberg that he was there to pick up his car, Rosenberg told plaintiff that he did not want to do business with him.

■ We conclude that the trial court did not err in finding that defendant's foregoing actions reasonably indicated to plaintiff that defendant would not deliver to him a Prowler under the Agreement. As we determined above, defendant contracted to deliver a Prowler to plaintiff as soon as possible. It was not against the manifest weight of the evidence for the trial court to find that defendant repudiated the

Agreement when it repeatedly informed plaintiff that it would not deliver to him the first Prowler it received. Such actions made it sufficiently clear to plaintiff that defendant would not perform under the Agreement. *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 317-18 ("a promisor's language must be sufficiently clear and distinct to be reasonably interpreted to mean that the promisor cannot or will not perform").

Defendant next asserts that plaintiff's testimony that he would have purchased a second Prowler indicates an intent to perform under the contract. Thus, there cannot be a repudiation where both parties' actions indicated an intent to perform. We disagree. As we discussed above, defendant's actions indicated to plaintiff that defendant would *not* perform under the Agreement. With respect to plaintiff's actions, section 2—610(b) of the UCC provides that an aggrieved party may "resort to any remedy for breach" of the contract "even though he has notified the repudiating party that he would await the latter's performance." 810 ILCS 5/2—610(b) (West 2000). One such remedy is to cover. 810 ILCS 5/2—711(1)(a) (West 2000) (buyer may effect cover, upon seller's repudiation, whether or not buyer cancels the contract). The statute is clear that a buyer's willingness to proceed with performance under a contract does not excuse a repudiation. Thus defendant's argument fails.

Defendant next asserts that, even if there was a repudiation in September or October of 1997, plaintiff did nothing to indicate that he thought this was the case. He took no self-help measures such as: terminating the contract; seeking to enjoin the sale to Palandri; requesting a retraction; or suspending his performance obligations. Again, we disagree. The UCC does not require a party to request assurances as a condition precedent to recovery. See *Shields Pork Plus, Inc.*, 329 Ill. App. 3d at 319.

For the foregoing reasons, we conclude that the trial court's finding of repudiation was not against the manifest weight of the evidence.

## 2. *Breach of Contract*

 Defendant next asserts that the trial court erred in finding that it breached the Agreement, where the contract protected only the price of the vehicle and expired on December 30, 1997. Defendant contends that plaintiff did not contract to purchase the first Prowler delivered to defendant and that the court erred in relying on plaintiff's testimony about the August and September telephone conversations.

As we determined above, plaintiff contracted to receive a Prowler as soon as possible from defendant. Rosenberg testified that plaintiff was the first individual to order, and to forward a deposit for delivery

of, a Prowler. We thus reject defendant's argument that the contract merely locked in a price at which plaintiff could purchase a vehicle. The trial court's finding that defendant breached the Agreement when it sold the first Prowler it received in 1997 to Palandri was therefore not against the manifest weight of the evidence.

### 3. *Calculation of Damages*

Defendant next asserts that the trial court erred in calculating the damages award. Defendant argues that, assuming a breach, the proper measure of damages for repudiation of the Agreement is set forth in section 2—713 of the UCC: the difference between market price at the time the plaintiff learned of the breach and the contract price. 810 ILCS 5/2—713 (West 2000). Thus, damages should have been awarded in the amount of $5,000, which equals the difference between Palandri's purchase price and the Agreement's price.

■ Section 2—711 of the UCC provides, in relevant part:

"§ 2—711. Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods. (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2—612), *the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid*

(a) *'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract*; or

(b) recover damages for non-delivery as provided in this Article (Section 2—713)." (Emphasis added.) 810 ILCS 5/2—711 (West 2000).

Section 2—712 of the UCC provides, in relevant part:

"§ 2—712. 'Cover'; Buyer's Procurement of Substitute Goods. (1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2—715), but less expenses saved in consequence of the seller's breach." 810 ILCS 5/2—712 (West 2000).

■ Section 2—713 of the UCC provides:

"§ 2—713. Buyer's Damages for Non-Delivery or Repudiation. (1) Subject to the provisions of this Article with respect to proof of market price (Section 2—723), the measure of damages for non-

delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2—715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance as of the place of arrival." 810 ILCS 5/2—713 (West 2000).

Comment 5 to section 2—713 of the UCC provides:

"5. *The present section provides a remedy which is completely alternative to cover under the preceding section and applies only when and to the extent that the buyer has not covered.*" (Emphasis added.) 810 ILCS Ann. 5/2—713, Comment, at 450 (Smith-Hurd 1993).

▮ We reject defendant's argument that section 2—713 provides the correct formula to calculate damages in the case of a repudiation and where the aggrieved party has covered. As noted in comment 5 to that section, section 2—713 applies in cases where the aggrieved party has not effected cover. 810 ILCS Ann. 5/2—713, Comment, at 450 (Smith-Hurd 1993); *Neibert*, 219 Ill. App. 3d at 193. Rather, in situations where the party has effected cover, section 2—712(2) provides the appropriate measure of damages: the difference between the cost of cover and the contract price. 810 ILCS 5/2—712(2) (West 2000).

The trial court utilized this formula to calculate the damages award, and we do not quarrel with its calculation.

### 4. *Appropriateness of Plaintiff's Cover*

▮ Defendant's final argument is that the trial court erred in calculating the damages award because plaintiff effected an inappropriate cover. Defendant contends that plaintiff did not recontact the 38 dealers he had called in September 1997 to inquire if they would sell him a Prowler. Instead, on the same day that Rosenberg refused to sell him a car, plaintiff visited another dealership and purchased a Prowler for about $40,000 over the list price.

Comment 2 to section 2—712 of the UCC provides, in relevant part:

"The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest and most effective." 810 ILCS Ann. 5/2—712, Comment, at 447 (Smith-Hurd 1993).

Plaintiff testified that he called Rosenberg on September 22 to

inform him that defendant was on a tentative list to receive a Prowler and that Rosenberg responded that he would not sell to plaintiff a car and that plaintiff was not the first person with whom he had contracted. Rosenberg testified that he informed plaintiff on this date that the Prowler was "already committed." The trial court also heard plaintiff's testimony that, following his September 22 conversation with Rosenberg, he had "serious doubts" that defendant would sell to him a Prowler and he contacted about 38 dealerships to inquire about purchasing a vehicle, but was unable to obtain a car. Following Rosenberg's refusal to sell a car to plaintiff on October 25, plaintiff visited another dealership on that day and purchased a Prowler for about $30,000 over what he would have paid defendant for the same car. The trial court concluded that the price plaintiff ultimately paid for a Prowler was the "best price" he could receive after defendant refused to sell a car to him. We agree. The trial court heard testimony from both parties about the Prowler's limited supply. It also heard plaintiff's testimony about his efforts to obtain a car one month before his purchase date. We conclude that the court's determination that plaintiff effected a proper cover was not against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

KAPALA and GILLERAN JOHNSON, JJ., concur.