# Illinois Official Reports

## Appellate Court

---

### *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*,
### 2019 IL App (1st) 172858

---

| | |
|---|---|
| Appellate Court Caption | UNION TANK CAR COMPANY, Plaintiff-Appellee and Cross-Appellant, v. NuDEVCO PARTNERS HOLDINGS, LLC, Defendant-Appellant and Cross-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-17-2858 |
| Filed | January 15, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-L-2559; the Hon. Diane M. Shelley, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | Duane Morris LLP, of Chicago (Paul E. Chronis and Elinor H. Murárová, of counsel), for appellant.<br><br>DLA Piper LLC, of Chicago (Thomas F. Geselbracht and Eric M. Roberts, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Lavin and Pucinski concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a 2017 bench trial, plaintiff-appellee, Union Tank Car Company (Union Tank), was awarded $1.27 million in damages as a result of the breach of a lease guaranty by defendant-appellant, NuDevco Partners Holdings, LLC (NuDevco). On appeal, NuDevco challenges the verdict, claiming the trial court erred by (i) concluding that Union Tank's cause of action was not governed by the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 *et seq.* (West 2016)), (ii) awarding Union Tank damages when Union Tank failed to satisfy the UCC's condition precedent to the recovery of damages, (iii) awarding damages to Union Tank for anticipated blasting and future storage costs, and (iv) admitting certain evidence, which, in turn, influenced the amount of damages.

¶ 2        Union Tank cross-appeals from the trial court's refusal to award the present value of lost future rent under the lease and the trial court's deduction of $10,000 from Union Tank's petition for attorney fees.

¶ 3        For the reasons that follow, we affirm in part and vacate in part.

¶ 4                                    BACKGROUND

¶ 5        In January 2003, Ponderosa Petroleum Company (Ponderosa) entered into a lease with General Electric Railcar Services Corporation (GE Railcar) for 47 railcars to carry crude petroleum. In the ensuing years, the parties executed numerous riders providing for lease terms ending between May 2017 and February 2020. On April 1, 2015, Associated Energy Services, LLC (Associated Energy) assumed the obligation to make payments under the lease, although Ponderosa remained a party to the lease.

¶ 6        Associated Energy is a wholly owned subsidiary of NuDevco. On March 3, 2015, NuDevco executed a guaranty in favor of GE Railcar to pay Associated Energy's obligations under the lease. The terms of the guaranty provided that NuDevco would

> "absolutely, irrevocably and unconditionally guarantee the full and prompt payment when due of all the obligations *** due under the Leases, including, but not limited to, rent, service charges, freight, railroad charges, *** [and] cleaning charges *** together with all other sums which may or shall become due and payable pursuant to the provisions of the Leases, including, without limitation, any damages resulting from the Lessee's failure to perform its obligations thereunder."

The guaranty further provided that NuDevco would reimburse Union Tank for all costs it incurred in enforcing the guaranty, including reasonable attorney fees.

¶ 7        In September 2015, Union Tank acquired the lease, riders, and railcars from General Electric Capital Corporation, which owned or controlled (directly or indirectly) all of the interest in GE Railcar.

¶ 8        On September 1, 2015, Associated Energy sent a notice of termination of the lease to GE Railcar citing as justification that the cars were approaching the end of their permitted use to haul crude oil. No provision of the lease authorized termination for this reason. At the same time, Associated Energy also began returning the railcars to Union Tank. Associated Energy discontinued rental payments as of September 30, 2015, and returned all the leased cars to Union Tank by December 2015. Union Tank then invoked the guaranty, but NuDevco refused to honor it.

¶ 9 On March 10, 2016, Union Tank filed a complaint against NuDevco alleging breach of the guaranty. The complaint alleged that the reason given for Associated Energy's termination of the lease was not valid per the lease terms and NuDevco's refusal to comply with Union Tank's demand for payment was a material breach of the guaranty.

¶ 10 At the bench trial, Union Tank presented evidence that Associated Energy sent all of the leased railcars to a Union Tank facility in Evanston, Wyoming, without first informing Union Tank. Because that facility was unable to process that number of cars, Union Tank transferred 39 of the 47 railcars to a facility in Kansas, 2 of the cars to a facility in Texas, and kept only 6 in Wyoming. The cars were cleaned at those locations, at a cost of $137,690.09, of which Associated Energy paid only $60,710. Union Tank also incurred costs (known as "freight") in moving the railcars from Wyoming to Kansas and Texas and "switching" charges in connection with transporting the cars. A switching charge is incurred when a car is transported from a main line railroad and "switched" to storage by way of a short-line railroad or privately held yard.

¶ 11 Union Tank had to pay to store the cars after their return, as it had excess inventory of those specific railcars and could not market them to new customers. (Union Tank had insufficient yard space to store the cars on its own and generally shipped excess inventory to third-party rail yards.) Union Tank again incurred freight and switching charges in shipping the cars from where they were cleaned to where they were ultimately stored. Through the date of trial, Union Tank incurred $192,975.80 in freight costs, $9605 in switching costs, and $41,315.30 in storage charges.

¶ 12 As evidence to support these incurred costs, Union Tank introduced invoices that it received from third parties. While none of the third parties generating the invoices were called to testify, Frederick Koenig, a 40-year Union Tank employee currently serving as Union Tank's director of fleet repair, testified that Union Tank receives freight invoices through an Internet portal or via e-mail in the ordinary course of its business. A Union Tank employee then signs the invoice, whereupon it is routed to the accounts payable department, which generates payment by check or electronically. William Constantino, the general manager of Union Tank's leasing business unit, testified that he receives similar invoices for storage, switching, and cleaning charges, which are checked for accuracy and then sent to him for countersignature if above a certain amount. According to Constantino, he receives these invoices during the normal and typical course of his business activity anytime Union Tank has idle equipment in storage. Finally, Union Tank's controller and vice president for the leasing business unit, James Murauskis, testified that, after the invoices (for cleaning, freight, storage, or switching) are routed to accounts payable, the invoices are paid.

¶ 13 Murauskis's testimony regarding payment was based on a spreadsheet Union Tank generated in the course of its business. That spreadsheet listed the bills associated with the 47 railcars Associated Energy returned and linked each invoice to the authorization for payment by wire transfer through Bank of America. NuDevco objected to Murauskis's testimony on this issue given that the payment confirmation pages from Bank of America were not introduced at trial.

¶ 14 In addition to the costs incurred as of the date of trial, Union Tank also sought $97,215.90 in storage costs for the remainder of the lease terms. In support of these costs, Constantino testified that in the beginning of 2016, shortly after Associated Energy returned the leased cars, Union Tank had 3000 DOT-111 cars (the type leased by Associated Energy) in storage and not

leased to customers. But by the end of 2016 and at the time of trial, Union Tank had leased only 550 DOT-111 cars to new lessees while the number of cars in storage had increased to 6000. (The remainder of Union Tank's DOT-111 inventory—approximately 16,000 cars—was leased.) Constantino testified that the pace of leasing these cars was not increasing. While Constantino nevertheless expected to eventually re-lease the 47 cars Associated Energy returned, he admitted that he could not make a final determination as to the fate of the cars until they are brought to the repair shop and Union Tank undertakes an economic evaluation of their condition.

¶ 15 Finally, the evidence at trial revealed that before it could lease the 47 railcars to other customers, Union Tank would need to "blast" the interior of the cars to remove the residue from the prior service, namely, crude oil. Union Tank introduced evidence that the railcars would necessarily be used to transport something other than crude oil, as they no longer complied with governmental regulations for the transport of crude petroleum. Based on the size of the cars, blasting would cost Union Tank $109,930; however, blasting had not occurred as of the date of trial, given that the cars had not yet been reassigned to transport a different commodity.

¶ 16 Following the conclusion of Union Tank's case in chief, NuDevco moved for a directed verdict, which was denied after briefing. NuDevco did not present any evidence, and on May 18, 2017, the trial court found in favor of Union Tank, awarding it $192,975.80 in freight costs, $207,510.18 in cleaning costs, $41,315.30 in past due storage costs, $97,214.90 in future storage costs, $109,930 in "anticipated future blasting," and $743,912.90 in past due rent, amounting to a total of $1,332,149, plus prejudgment interest and attorney fees to be determined. The trial court did not award damages for the present value of future rent because the lease did not contain a rent acceleration clause.

¶ 17 Union Tank filed its attorney fee petition, and while that petition was pending, NuDevco moved for reconsideration of the trial court's judgment, which was denied.

¶ 18 On December 21, 2017, the court issued its order on the fee petition and other miscellaneous relief, granting Union Tank attorney fees in the amount of $255,139.66, which was $10,000 less than Union Tank requested, based on the court's finding that the $10,000 was for excessive, redundant, or otherwise unnecessary work. The December 2017 order also reduced Union Tank's damages to reflect a miscalculation in cleaning costs and additionally awarded $9605 in switching costs, reducing the judgment to $1,271,935.80.

¶ 19 NuDevco timely appeals, and Union Tank cross-appeals.

ANALYSIS

¶ 21 NuDevco urges reversal of the trial court's decision on four grounds. We consider each in turn.

¶ 22 Initially, NuDevco argues that the trial court erred in finding the UCC inapplicable to Union Tank's cause of action alleging breach of the guaranty. This is a question of law which we review *de novo*. *Hessler v. Crystal Lake Chrysler-Plymouth, Inc.*, 338 Ill. App. 3d 1010, 1017 (2003) (applying *de novo* review to trial court's construction of contract).

¶ 23 At the outset, we acknowledge that the UCC is applicable to any transaction that creates a lease. 810 ILCS 5/2A-102 (West 2016). Here, however, Union Tank did not sue Associated Energy based on its breach of the lease but sued NuDevco for its failure to perform under the

guaranty. NuDevco maintains that this is a distinction without a difference given that its liability under the guaranty is predicated on the amounts due under the lease. We disagree.

¶ 24 Notwithstanding the fact that the guaranty would not have been triggered but for Associated Energy's breach of the lease, the guaranty, as the trial court aptly noted, is a contract in and of itself. See *TH Davidson & Co. v. Eidola Concrete, LLC*, 2012 IL App (3d) 110641, ¶ 10 (guaranty is contract subject to traditional principles of contractual interpretation). And the guaranty, unlike the lease, was not a contract for the lease of goods or services but was a promise to pay a debt. Contracts promising to pay a debt are not governed by the UCC, and none of the cases NuDevco relies on support a conclusion to the contrary. Under these circumstances, we conclude that the UCC is not applicable to the guaranty.

¶ 25 Because we conclude that the trial court correctly found the UCC inapplicable to Union Tank's cause of action for breach of the guaranty, we necessarily reject NuDevco's argument that the trial court erroneously allowed Union Tank to recover notwithstanding its alleged failure to satisfy the UCC's conditions precedent to recovery.[1]

¶ 26 Next, NuDevco contends that the trial court erred in awarding damages to Union Tank for anticipated blasting and future storage costs. We review a trial court's damages award under the manifest weight of the evidence standard. *Bell Leasing Brokerage, LLC v. Roger Auto Service, Inc.*, 372 Ill. App. 3d 461, 473 (2007). A decision is against the manifest weight of the evidence only when the opposite conclusion is apparent or the findings are unreasonable or arbitrary. *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 59. Given that the trial court is the finder of fact, its award of damages is entitled to substantial deference. See *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 80.

¶ 27 NuDevco bases its argument on the well-settled principle that a plaintiff is not entitled to recover damages that are remote, speculative, or uncertain. *Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 403 Ill. App. 3d 468, 485 (2010). Instead, a plaintiff must establish an actual loss with measurable damages in order to recover. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2016 IL App (1st) 142754, ¶ 85. Importantly, however, "absolute certainty" with respect to the damage amount is not required. *Kirkpatrick v. Strosburg*, 385 Ill. App. 3d 119, 130 (2008). Rather, so long as the existence of damages is certain, a plaintiff need not necessarily establish the precise amount of damages. See *Westlake Financial Group, Inc. v. CDH-Delnor Health System*, 2015 IL App (2d) 140589, ¶ 51. A contrary rule would "immunize *** defendants from the consequences of their wrongful conduct" by allowing them to escape liability merely because the amount of damages they have caused cannot be proved with mathematical certainty. *Id.*

¶ 28 Turning first to future storage costs, while Union Tank had not incurred these costs as of the date of trial, this does not necessarily render the costs too speculative to support an award of damages. The need to recover future storage costs was supported by Constantino's

---

[1]Under the UCC, in order to be entitled to recovery, Union Tank would have to show that it was unable after a reasonable effort to dispose of the cars at a reasonable price or that circumstances indicated that such an effort would have been unavailing. 810 ILCS 5/2A-529(1)(b) (West 2016). Union Tank's damages would also be reduced by the value of the available market rent for the leased goods. *Id.* § 2A-528(1). We note that, even if the UCC applied, the proof Union Tank adduced at trial showed that its inventory of unleased DOT-111 railcars doubled from the date of Associated Energy's breach through trial, thus supporting the reasonable inference that there was no market for the cars.

testimony that in 2016, Union Tank had leased only 550 DOT-111 cars to new customers, leaving 6000 unleased cars in its inventory. This excess inventory of the DOT-111 cars, coupled with Constantino's testimony that the demand for the cars was not increasing, is a reasonable basis for concluding that UTC will incur storage costs for the 47 cars leased to Associated Energy through the end of the cars' last lease term in 2020.

¶ 29    To the extent that NuDevco argues that testimony regarding the need for future storage costs was unreliable due to the fact that the testifying witness was not an expert, we disagree. A lay witness is permitted to give opinion testimony where it is based on that witness' personal observation, is one the witness is competent to make, and assists in a clearer understanding of the relevant issues. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 44. Constantino, who testified to the need for future storage and blasting costs, was the general manager of leasing for Union Tank. As such, the market demand for the cars was certainly within his purview. We cannot say the trial court's decision to allow his testimony notwithstanding the fact that he was not qualified as an expert in the rental market of railroad cars was an abuse of discretion. See *id.* (reviewing trial court's decision to allow lay witness testimony for abuse of discretion).

¶ 30    With regard to anticipated blasting, however, we agree with NuDevco that these damages are too speculative to be recoverable. The extent of Union Tank's surplus of DOT-111 railcars and the anemic rate of new leases suggests that it is highly unlikely these 47 cars will ever be re-let to transport a different commodity so as to require blasting. This is particularly true where Constantino testified that the cars had not yet undergone an economic evaluation of their condition in Union Tank's repair shop, which was required before Union Tank could determine whether they could be remarketed in the first place. Further, as NuDevco points out, it is incongruous to award both future storage costs, which will only be incurred if the cars are *not* re-let by the end of the lease terms, and costs for blasting, which will be incurred if the cars *are* re-let. This inconsistency compels us to conclude that the trial court's decision on this element of damages was against the manifest weight of the evidence. See *Jameson Real Estate, LLC*, 2018 IL App (1st) 171534, ¶ 59 (decision is against manifest weight of the evidence where opposite conclusion is apparent). We therefore vacate this component of the damage award.

¶ 31    Finally, NuDevco argues that the trial court erred in admitting evidence of third-party invoices and testimony that those invoices were paid. A trial court has broad discretion regarding the admission of evidence, and we will not disturb the court's ruling absent an abuse of discretion. *Wheeler Financial, Inc. v. Law Bulletin Publishing Co.*, 2018 IL App (1st) 171495, ¶ 104. An abuse of discretion is the most deferential standard of review, and a trial court abuses its discretion only when its decision is unreasonable, arbitrary, or no reasonable person would take the view it adopted. *Gulino v. Zurawski*, 2015 IL App (1st) 131587, ¶ 64.

¶ 32    At trial, Union Tank relied on the business records exception to the general rule prohibiting hearsay to introduce the third-party invoices as evidence. Under this exception, the proponent of evidence must show that the record was kept in the ordinary course of business and it was the regular practice of the business to make that record at that time. *City of Chicago v. Old Colony Partners, L.P.*, 364 Ill. App. 3d 806, 819 (2006); see also Ill. S. Ct. R. 236(a) (eff. Aug. 1, 1992). Records made by a third party may be admissible as business records so long as the person authenticating the record was either their custodian or other person familiar with the business and its mode of operations. *Bank of America, N.A. v. Land*, 2013 IL App (5th)

120283, ¶ 13. Significantly, the circumstances surrounding the making of the record, including the lack of personal knowledge, go to the weight of the evidence rather than its admissibility. *PennyMac Corp. v. Colley*, 2015 IL App (3d) 140964, ¶ 17.

¶ 33 The theory underlying the business records exception to the hearsay rule is that because their purpose is to aid the business (and they are useless for that purpose unless accurate), there is no motive to falsify the record and every reason to ensure its accuracy. *Kimble v. Earle M. Jorgenson Co.*, 358 Ill. App. 3d 400, 413-14 (2005).

¶ 34 NuDevco's primary objection to the introduction of the invoices is that they were prepared by third-party service providers who were not called as witnesses. But this alone does not preclude their admission where the foundational requirements are satisfied. *Id.* at 413. *Old Colony Partners* is instructive. There, the plaintiff challenged the admission of certain documents an architecture firm provided to the defendant at the defendant's request. *Old Colony Partners*, 364 Ill. App. 3d at 820. The trial court admitted the documents as business records based on the testimony of the defendant's property manager, who testified that she maintained the documents from the architecture firm on site in the ordinary course of business and confirmed that the documents were received by the defendant. *Id.* On appeal, we affirmed the trial court's decision to admit the documents, notwithstanding the fact that the property manager could not testify as to how they were generated. *Id.*

¶ 35 Likewise, in this case, Koenig and Constantino testified that they maintained the third-party invoices and confirmed that they received the invoices on a regular basis by e-mail or Internet portal during the ordinary course of Union Tank's business. Koenig also identified the relevant portions of the invoices, including the car number to which they corresponded and the initials of the Union Tank employee approving them for payment. Under these circumstances, the fact that there was no testimony regarding how the invoices were generated does not compel a conclusion that no reasonable person would find the foundational requirements for the business records exception satisfied. This is particularly true since Union Tank relied on these invoices to make payments to third parties.

¶ 36 *Apa v. National Bank of Commerce*, 374 Ill. App. 3d 1082 (2007), on which NuDevco relies, is inapposite. There, we considered the admissibility of the plaintiff's bank statements as business records evidencing his lost income from the conversion of a bus he had purchased. *Id.* at 1084. We acknowledged that the business record need not be created by the party seeking to introduce it in order to be admissible but held that the proponent of the record nevertheless needed to satisfy Rule 236's foundational requirements, namely that the record was made in the regular course of business at or near the time of the occurrence. *Id.* at 1087-88. Finding that the plaintiff failed to present evidence of "the circumstances of [the statements'] creation," we held that the trial court abused its discretion in admitting the bank statements. *Id.* at 1088.

¶ 37 Here, too, there was no evidence of the invoices' creation. But unlike *Apa*, where the plaintiff used the bank statements solely to establish his damages and did not introduce evidence indicating that he relied on the bank statements in the course of his business, in this case, the evidence established that Union Tank *did* rely on the accuracy of the invoices in that it made payments based on them. This diminishes the concern that they are inaccurate or falsified, which forms the basis of the general rule prohibiting hearsay evidence. *Kimble*, 358 Ill. App. 3d at 414.

¶ 38 We likewise reject NuDevco's argument that the testimony regarding the fact that the invoices were paid was inadmissible because Union Tank did not produce the Bank of

America payment confirmation statements. For this argument, NuDevco cites the best evidence rule, which prefers the production of the original documentary evidence when the contents of that document are sought to be proved. See *Village Discount Outlet v. Department of Employment Security*, 384 Ill. App. 3d 522, 526 (2008). It is sufficient to note that the best evidence rule applies only when the contents or terms of a writing are at issue and must be proved. *People v. Davis*, 2014 IL App (4th) 121040, ¶ 20 (citing *People v. Pelc*, 177 Ill. App. 3d 737, 742 (1988)). Here, however, the issue was not the content of the payment confirmation, but whether the payment was made. And the fact that a payment was made existed independent of any writing confirming that payment. Accordingly, the best evidence rule is inapplicable. *Continental Illinois National Bank & Trust Co. of Chicago v. Eastern Illinois Water Co.*, 31 Ill. App. 3d 148, 159 (1975) ("The best evidence rule does not apply where a party seeks to prove a fact which has an existence independent of any writing, even though the fact might have been reduced to, or is evidenced by, a writing.").

¶ 39 Because we find that the evidence regarding the invoices and their payment was properly admitted, we reject NuDevco's argument that it was error for the trial court to award damages based on this evidence.

¶ 40 Having disposed of NuDevco's arguments, we turn next to Union Tank's cross appeal. Initially, Union Tank challenges the trial court's deduction of $10,000 from the attorney fees it requested pursuant to the terms of the guaranty. We review an award of attorney fees for an abuse of discretion. *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29.

¶ 41 After considering Union Tank's fee petition, the trial court reduced the amount of attorney fees Union Tank requested by $10,000 after finding that "some of the work" performed by Union Tank's counsel was duplicative. Union Tank points out that the court's order referred only to entries in November 2015, which amounted to $5917.50 in fees, less than the $10,000 the trial court deducted. However, the trial court's decision in no way suggested that the work it found redundant, excessive, or otherwise unnecessary was limited to services rendered in November. Indeed, in its response in opposition to Union Tank's petition for fees, NuDevco pointed to $13,688.50 in excessive or duplicative fees, in January, February, and March 2016. For example, time entries on February 2 and 3, 2016, reflect that two attorneys charged for reviewing e-mails from each other. Similarly, entries in March 2016 reveal that multiple attorneys billed Union Tank for reviewing the same draft complaint. The trial court's order supports the conclusion that it considered these other entries in finding $10,000 in fees to be redundant or unnecessary, and we cannot say that the trial court's decision to reduce the fee award under these circumstances was an abuse of discretion.

¶ 42 Finally, Union Tank argues that the trial court should have awarded it the present value of future rent under the leases through their expiration dates. As discussed *supra* ¶ 26, we review a trial court's decision on damages under a manifest weight of the evidence standard.

¶ 43 Because this argument turns heavily on the construction of the guaranty, we transcribe it in full here:

> "The Guarantor hereby guarantees, as principal and not as surety, absolutely, irrevocably and unconditionally, the full and prompt payment when due of all of the obligations, whether primary, secondary, direct, contingent, sole, joint, several or joint and several, due under the Leases, including, but not limited to, rent, service charges, freight, railroad charges, lessee responsible repairs and maintenance, casualties, return obligations, cleaning charges, taxes and governmental impositions, assessments,

customs and duties, mandated modification charges, fines, penalties and other charges, costs associated with removal of liens and encumbrances, high mileage utilization and indemnity obligations thereunder, together with all other sums which may or shall become due and payable pursuant to the provisions of the Leases, including, without limitation, any damages resulting from the Lessee's failure to perform its obligations thereunder."

Union Tank parses the guaranty into two subparts defining NuDevco's responsibilities: first, NuDevco guarantees prompt payment of all of the obligations due under the lease, and second, it guarantees "all other sums which may or shall become due" pursuant to the lease terms, including damages resulting from Associated Energy's failure to perform its obligations under the lease. According to Union Tank, it is this second clause (the "guaranty of damages") that entitles Union Tank to acceleration of rent based on the breach of the lease.

¶ 44    Damages for breach of contract are intended to place the nonbreaching party in the same position as if the contract had been performed. *Delatorre v. Safeway Insurance Co.*, 2013 IL App (1st) 120852, ¶ 36. To that end, all damages foreseeably resulting from a breach are generally recoverable. *Midland Hotel Corp. v. Rueben H. Donnelley Corp.*, 118 Ill. 2d 306, 318 (1987). However, as NuDevco correctly points out, Illinois common law does not recognize a present obligation to pay future rent in the event of a breach of contract. *Miner v. Fashion Enterprises, Inc.*, 342 Ill. App. 3d 405, 416-17 (2013). For that reason, the failure to pay rent when it accrues does not accelerate the unpaid rent absent a contractual provision to that effect. *Id.*

¶ 45    Neither the guaranty nor the lease says anything about rent acceleration in the event of breach of the lease. Instead, the guaranty only provides that NuDevco guarantees "damages" resulting from Associated Energy's breach of the lease. Under the common law, damages for breach of a lease do not include future rent (*id.*), thus precluding Union Tank from recovering this amount.

¶ 46    In an attempt to avoid this conclusion, Union Tank relies on the UCC to support its argument that it is entitled to the present value of future rent. But Union Tank previously argued that the UCC does not govern the guaranty, as it is a contract separate from its lease with Associated Energy. It strains logic to conclude, as Union Tank urges, on the one hand, that the UCC cannot limit Union Tank's recovery, but on the other, its provisions can serve to increase Union Tank's damages award. Accordingly, having agreed with Union Tank that the UCC is inapplicable to a cause of action alleging breach of the guaranty (*supra* ¶ 24), we conclude that Union Tank cannot rely on the UCC to support its argument for rent acceleration, particularly when the lease does not contain a rent acceleration clause.

¶ 47    We do not agree with Union Tank's contention that this conclusion nullifies the guaranty of damages clause. See *Guterman Partners Energy, LLC v. Bridgeview Bank Group*, 2018 IL App (1st) 172196, ¶ 51 (courts should not interpret a contract to nullify or render provisions meaningless; all provisions in a contract are presumed to have a purpose). The present value of future rent is not the only "damage[ ] resulting from [Associated Energy's] failure to perform its obligations [under the lease]." The damages resulting from Associated Energy's breach of the lease also include the future storage costs. Contrary to Union Tank's contention, these damages are not encompassed under the guaranty of prompt payment clause, which allows Union Tank to recover the accrued rent and the freight, railroad, and cleaning charges defined in the lease. Thus, the two clauses of the guaranty—the guaranty of prompt payment and the

guaranty of damages—can be read in harmony without application of the UCC.

¶ 48                                  CONCLUSION

¶ 49        For the foregoing reasons, we affirm the trial court's judgment in favor of Union Tank and its award of damages for freight costs, cleaning costs, past due storage costs, future storage costs, and past due rent but vacate the court's award of damages for anticipated future blasting in the amount of $109,930. With respect to Union Tank's cross-appeal, we affirm the $10,000 reduction in attorney fees and the judgment in favor of NuDevco on Union Tank's request for an award of the present value of future rent due under the leases.

¶ 50        Affirmed in part and vacated in part.