2021 IL App (1st) 192323-U

SIXTH DIVISION
July 23, 2021

No. 1-19-2323

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| EXPEDITED, INC., an Illinois Corporation, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 L 012164 |
| | ) | |
| DRAGAN KORUNOVSKI and KATERINA KORUNOVSKI, | ) | The Honorable |
| | ) | Ann Collins-Dole, |
| | ) | Judge Presiding. |
| Defendants-Appellants. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's judgment—finding in the plaintiff's favor on claims of breach of fiduciary duty, fraud, civil conspiracy, and unjust enrichment—is affirmed where (1) the court had jurisdiction over this dispute, (2) the court's findings were supported by the evidence (3) the court did not err in admitting or relying on the plaintiff's evidence, and (4) an award of punitive damages was not improper.

¶ 2     Plaintiff Expedited, Inc., filed a four-count verified complaint against defendants Dragan and Katerina Korunovski (collectively, the Korunovskis). After a bench trial, the trial court found in favor of Expedited on all four counts and found the Korunovskis jointly and severally liable to Expedited for $417,744.02. The Korunovskis appeal from that judgment, raising a host of

arguments falling into four general categories: (1) the trial court lacked jurisdiction to enter a judgment against them, (2) the verdict was against the manifest weight of the evidence, (3) the trial court erred in admitting certain exhibits, and (4) the trial court erred in assessing punitive damages. We reject each of these arguments and affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Expedited was formed in January 2011 by Nada Dragojevic and Dragan Korunovski as a motor carrier that transported shipments for customers using drivers contracted by Expedited. Dragan's wife, Katerina Korunovski, was hired to work in Expedited's billing department. By July or August 2015, when it became clear that Expedited was in financial trouble, the Korunovskis had both left the business.

¶ 5     On December 13, 2016, Expedited filed its verified complaint against the Korunovskis, alleging claims of breach of fiduciary duty (count I), fraud (count II), civil conspiracy (count III), and unjust enrichment (count IV). Expedited sought, jointly and severally from the Korunovskis, a combined judgment of $755,099.66, including punitive damages.

¶ 6     A bench trial was held over several days in February 2019. The witnesses included Nada, Dragan, and Katerina, as well as two other Expedited employees, Nada's daughter, Marija Dragojevic, and Ashley Wenholtz. The evidence presented was as follows.

¶ 7     Nada testified that when they formed Expedited, she and Dragan were partners and shared the profits equally, with Nada serving as the president and Dragan as the vice president, but with Nada as the sole shareholder. Marija and Ashley also identified Dragan as the company's vice president. Nada described Dragan as the "financial officer" of the company—he wrote checks, handled payroll, paid the drivers, and oversaw the billing department. Nada testified that Dragan could fire employees, received a salary and bonuses, and that she trusted him.

¶ 8      Nada explained that Expedited had approximately seven employees, including three billing clerks: Katerina, Marija, and Ashley. Marija testified that she and her co-clerks were responsible for creating and maintaining customer invoices. Expedited would hire a driver to pick up and deliver a load for an Expedited customer, such as FedEx. Once a shipment was delivered, Expedited would then receive a document confirming the delivery—generally called a bill of lading. At that point, the clerk would close the invoice, print it, attach the bill of lading to it, and send the invoice for payment.

¶ 9      Nada testified that Expedited sent most customer invoices to JD Factors—a factoring company—to avoid the delay in payment that would occur if Expedited billed the customer directly. JD Factors would pay an invoice within a day or two and would in turn invoice and eventually be compensated by Expedited's customer. JD Factors used an "aging list" showing how long invoices had remained unpaid to keep track of what it was owed from Expedited's customers. Expedited employees could access the aging list with login credentials on the JD Factors website. If enough time passed and a customer did not pay an invoice, JD Factors would initiate a "charge back," deducting the amount of the invoice from the payments it made to Expedited. Marija testified that Dragan was responsible for verifying payments from JD Factors. Apart from CSX Intermodal Terminals Inc., a customer that required direct billing from Expedited, this was the process the company used to obtain payment on customer invoices.

¶ 10     Expedited used a computer program designed for the trucking industry called PCS to create its billing invoices. Marija testified that each employee had his or her own login and password for the software. For each new invoice, the software automatically generated an invoice number and one of Expedited's billing clerks would manually enter the rest of the invoice data. PCS tracked which employee account created each invoice.

¶ 11    Nada testified that, as the president of Expedited, she tracked the company's bank accounts so she knew when payments were made or received by Expedited. According to Nada, she and Dragan also talked about the profitability of Expedited weekly—"how much money did we bill, how much money did we invoice to JD Factors." Dragan would report to Nada how much profit the company made that week, and they would split the profits equally.

¶ 12    The evidence from Expedited showed that the Korunovskis' scheme involved three parts: (1) sending false invoices to JD Factors and receiving payment on those invoices, (2) sending the same loads to CSX directly and also to JD Factors, and (3) duplicating invoices to look like new invoices.

¶ 13    Nada was first clued into a scheme existing when, at some point, JD Factors started to deduct money as charge backs from every payment it made to Expedited. She talked about the issue with Dragan, and Dragan said that JD Factors must be "making mistakes or stealing money" from Expedited. Nada arranged a meeting at JD Factors, attended by herself, Dragan, and Katerina sometime in 2015. JD Factors explained that it was charging back for CSX and FedEx invoices that had not been paid by those customers. Nada asked Katerina to look into the FedEx invoices and when Nada followed up, Katerina responded that she was working on them.

¶ 14    Nada testified that, sometime in the summer of 2015, Dragan first told her that Expedited owed its drivers money. On July 18, 2015, he forwarded an email to Nada listing amounts owed to the drivers totaling over $100,000. Dragan asked Nada to borrow money to cover the debt, and she did, though not the full amount owed.

¶ 15    According to Nada, Dragan and Katerina left Expedited in July 2015 because Dragan said the company was bankrupt and "they had to take care of themselves."

¶ 16    Katerina left before the unpaid FedEx invoices had been resolved, so Nada asked Marija

to take over investigating that issue. For 15 FedEx invoices, totaling $51,765.82, Marija found that the drivers were not paid. She also could not find any bills of lading for those invoices. Marija e-mailed a FedEx employee, Mike Andrejco, who advised her that he could not approve payment for the loads she asked about because the "reference numbers listed do not match, nor do any of the trailer numbers."

¶ 17    Based on the e-mail from Mr. Andrejco, the fact that the drivers were not paid for loads, and her conversation with a driver listed on one of the unpaid invoice loads who said he had never completed that trip, Marija concluded that the 15 "unpaid" FedEx invoices were completely fraudulent invoices for loads that never occurred. Marija testified that each of these supposed loads had been booked by either Dragan or Katerina. Although Expedited had not yet been charged back for those 15 FedEx invoices when Marija started investigating them, FedEx had since demanded the money from those loads.

¶ 18    Marija also investigated why 25 CSX invoices totaling $51, 249.67 had been processed by JD Factors even though CSX was supposed to be billed directly by Expedited. These loads appeared to have been submitted twice, once to CSX and once to JD Factors.

¶ 19    Marija also found five other duplicated invoices during her investigation, booked by Dragan or Katerina, where "an original invoice and all the paperwork with it was copied and presented as a new invoice."

¶ 20    Ashley Wenholtz, who worked as a billing clerk at Expedited from the end of 2013 through the beginning of 2015, testified that she recalled shipments where a driver was paid only $5 between January and March of 2015. She noticed these because usually a driver was paid between $500 and $2000 for a trip, depending on the mileage. In approximately January 2015, Ashley asked Dragan about this, and he said that JD Factors "owed us money and it was okay." Ashley asked

Katerina too, and Katerina said the same—JD Factors "owed us money and so it was okay to do it." In addition, at Dragan's instruction, Ashley said between January and March of 2015 she sent invoices to JD Factors for CSX loads. She again asked Dragan and Katerina about this, and they both said that CSX was not paying Expedited fast enough "and it was okay to put [them] through to JD Factors."

¶ 21    Nada testified that she did everything she could to try to save Expedited, including using all of her personal savings and available credit to satisfy the company's debts. She borrowed $100,000 personally from a relative in June or July 2015, using the money to pay some of the drivers, pay off $69,000 worth of Expedited's credit card debts, and pay some of JD Factors's unpaid invoices for Expedited customers. Nada paid other Expedited debts with her personal credit cards. Nada also said she gave Dragan approximately $20,000 or $25,000 of the loan because he said he wanted to pay the drivers directly and did not want Nada to be present when he did. Nada did not know what Dragan did with that money, but she did not see it again. Nada was contacted by a bill collector for a company that Expedited purchased fuel from who told her Expedited owed that company $31,029.49. Nada negotiated that debt down to a lump-sum payment of $20,000. Nada borrowed $25,000 in the spring of 2015, later negotiating to repay only $22,000. And Nada used a personal credit card to pay $12,000 for Expedited's insurance.

¶ 22    At the time of trial, Expedited still owed JD Factors $170,000. Expedited had also gone out of business.

¶ 23    Dragan agreed that he worked at Expedited from January 2011 through July 2015 but denied that he was in fact the company's the vice president. Dragan did acknowledge, however, that he had told people he was the vice president of Expedited, he was still telling people he had been the vice president of Expedited at the time of trial, and his e-mail signature said he was the

vice president of Expedited. Dragan also filled out a contract with CSX in which he was listed as the vice president of Expedited. Dragan denied ever saying JD Factors owed Expedited money or was shorting money to Expedited, denied duplicating invoices, and denied trying to double-charge any entities. Although the DRAGANK83 login was used to create the false invoices, Dragan said he did not create those documents—because everyone used his login—or commit fraud against Expedited. Dragan testified that a separate entity, Skyway, Inc., had been created specifically to receive his profit-sharing payments. Skyway was owned by the Korunovskis. Katerina also denied that she created fraudulent or duplicate invoices, or that she committed fraud against Expedited.

¶ 24    The following documents were entered into evidence, largely over the Korunovskis' objections that they either lacked foundation or were inadmissible hearsay: 14 false FedEx invoices (exhibit 5), a dispatch and invoice from PCS for load No. 108060 (exhibit 6A), a FedEx aging report from JD Factors (exhibit 6B), Marija's notes on the unpaid FedEx invoices (exhibit 11), an e-mail exchange between Marija and Mika Andrejco about the unpaid FedEx invoices (exhibit 14), the CSX customer contract (exhibit 16), a CSX aging report from JD Factors (exhibit 17A), a PCS screenshot showing a CSX load being billed to JD Factors (exhibit 18A), a rate confirmation from customer CH Robinson for load No. 107334 (exhibit 20A), the invoice for load No. 107334 (exhibit 20E), an e-mail about the Fleet One debt collections (exhibit 30), Dragan's e-mail to Nada about the debt owed to the drivers (exhibit 31), Expedited's tax returns from 2011-2014 (exhibit 33), Expedited payroll history for Dragan, Skyway, and Katerina (exhibits 35, 36, and 37), a promissory note for a $100,000 loan made to Nada on February 26, 2016 (exhibit 39).

¶ 25    The parties filed written memoranda in lieu of presenting closing arguments.

¶ 26    On June 28, 2019, the trial court ruled in favor of Expedited, finding the Korunovskis liable on all four counts and awarding Expedited damages totaling $417,744.02. The court issued a 35-

page written ruling explaining in detail its reasoning with respect to each claim. On count I (breach of fiduciary duty), the court found that Dragan owed Expedited a fiduciary duty as a co-owner, the CFO, and the vice president, that Dragan had breached that duty by falsely inflating Expedited's assumed profits to increase his share of the proceeds, and that due to Dragan's actions, Expedited was forced to endure financial hardship, leading to its insolvency. On count II (fraud), the court found that the Korunovskis intentionally made knowing misrepresentations as to Expedited's past income in the form of "fraudulent and duplicitous invoices," Expedited was entitled to and did rely on those misrepresentations, as they were squarely within the Korunovskis' knowledge, and Expedited was damaged by its reliance. On count III (civil conspiracy), the court found that Expedited presented compelling circumstantial evidence that the Korunovskis agreed to use false invoices to create the appearance of greater profits, with the aim of artificially inflating the share of profits Dragan was entitled to receive, that the couple knowingly and voluntarily participated in that scheme, and that Expedited was harmed by their conduct. Finally, on count IV (unjust enrichment), the court found that Expedited proved that the Korunovskis had created false invoices to procure a benefit from JD Factors at Expedited's expense and had unjustly retained those funds to Expedited's detriment. The court also found that, as Expedited had proven that the Korunovskis were liable for both fraud and breach of fiduciary duty, punitive damages were an appropriate means of punishing and deterring such conduct. The court found the Korunovskis liable to Expedited, jointly and severally, as follows: $19,813.24 for count I, $238,491.06 for count II, $19,813.24 for count III, $39,626.48 for count IV, and $100,000 in punitive damages.

¶ 27    The court denied the Korunovskis' motion to reconsider, and this appeal followed.

¶ 28                                    II. JURISDICTION

¶ 29    The trial court denied the Korunovskis' motion to reconsider its June 28 order on October

21, 2019, and they timely filed their notice of appeal on November 13, 2019. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 30                                    III. ANALYSIS

¶ 31                          A. The Korunovskis' Motion to Strike

¶ 32    Before turning to the merits of the appeal, we address the Korunovskis' motion to strike Expedited's response brief, which we elected to take with the case. The Korunovskis insist that Expedited's brief should be stricken because Expedited attached documents to its appendix that were not part of the record on appeal, specifically documents filed with or printed from the website of the office of the Illinois Secretary of State. Although a party generally may not supplement the record on appeal by appending documents to its brief (*Scepurek v. Board of Trustees of Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066, ¶ 2), we may take judicial notice of public records, such as these documents from the Illinois Secretary of State (*Maldonado v. Creative Woodworking Concepts, Inc.*, 296 Ill. App. 3d 935, 938 (1998)). In deciding this appeal, we have thus taken judicial notice of these records to the extent that they are relevant to the issues raised.

¶ 33    The Korunovskis also argue that we should strike the statement of the issues presented and statement of the facts from Expedited's brief because Expedited improperly "changed" the issues the Korunovskis raised on appeal, misstated the facts established at trial, cited facts from the complaint that were not proven at trial, and included arguments in its statement of facts. Expedited responds that it reframed the issues presented because it "disagree[d] with the framing of the issues as set forth by the [Korunovskis]" and that it was permitted to include its own statement of facts.

¶ 34    Illinois Supreme Court Rule 341(i) (eff. Oct. 1, 2020) provides that an appellee's brief need not include a statement of the facts or the issues on appeal "except to the extent that the presentation

by the appellant is deemed unsatisfactory." It is absolutely proper for the appellee, in drafting its own brief, to decide what *it* deems unsatisfactory and requiring supplementation. In this manner, the appellate court can better ascertain the contours of the parties' dispute. *See U.S. Bank Trust National Ass'n v. Junior*, 2016 IL App (1st) 152109, ¶ 17 (noting that "the purpose of these rules is to require the parties to present clear and orderly arguments *** so that the court can property ascertain and dispose of the issues involved"). Thus, there is no reason for us to even consider the striking of Expedited's brief based on the fact that Expedited provided its own facts and definition of the issues on appeal.

¶ 35                    B. The Merits of the Korunovskis' Appeal

¶ 36    As noted, the Korunovskis arguments fall into four categories: (1) the trial court lacked jurisdiction to enter a judgment against them, (2) the evidence was insufficient to sustain the verdict, (3) the trial court erred in admitting certain documents, and (4) the trial court erred in assessing punitive damages. We consider each of these categories in turn.

¶ 37                    1. The "Jurisdictional" Arguments

¶ 38    The Korunovskis raise seven arguments that they label as "jurisdictional": (1) the case was preempted by the federal Carmack Amendment (see 49 U.S.C. § 14706(a)(1) (cited by Expedited); 49 U.S.C. § 14901(e)(1) (cited by the Korunovskis) (2014)), (2) at the time of trial, Expedited had been involuntarily dissolved and therefore had no legal capacity to sue, (3) Expedited failed to include Nada and Skyway as necessary parties, (4) count I was not pleaded against Katerina, (5) the trial court's judgment was founded on theories of causation not pleaded in the complaint, (6) the trial evidence did not support the judgment, and (7) the trial court's judgment relied on argument and pleadings rather than the trial evidence.

¶ 39    The last three arguments go simply to the sufficiency of the evidence, so we will address

them separately, as sufficiency has nothing to do with jurisdiction. See *Blount v. Stroud*, 232 Ill. 2d 302, 316 (2009) ("a court's jurisdiction does not depend upon the proofs at trial. Rather, the court's jurisdiction is dependent upon whether the plaintiff's case, as framed by the complaint or petition, presents a justiciable matter.").

¶ 40    We do not agree with the Korunovskis that any of the four arguments we address in this section really go to the trial court's jurisdiction either. As our supreme court has explained, " 'subject matter jurisdiction,' " which may be raised at any time, "refers to the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 333-34 (2002). Jurisdiction is conferred upon the trial court—with the exception of matters subject to administrative review—over "all 'justiciable matters.' " *Id.* at 334-35. The trial court's jurisdiction does not depend on the legal sufficiency of pleadings nor the ultimate outcome of a suit. *Id.* at 340. However, since none of these arguments have any merit, we need not resolve whether any could have deprived the circuit court of power to decide this case.

¶ 41    The Carmack Amendment did not preempt the trial court's jurisdiction over this case because it simply does not apply to the set of facts before us. The amendment generally provides that motor carriers transporting goods are liable for "actual loss or injury to the property caused by [the carrier]." *Converting Systems, Inc. v. Hot-Line Freight System, Inc.*, 344 Ill. App. 3d 1037, 1041 (2003) (citing *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1063 (7th Cir. 2000)). Here, although Expedited was an interstate carrier, its claims were not based on loss or injury to any property it was charged with transporting, so this case would not have been preempted by the Carmack Amendment. Even the authority cited by the Korunovskis makes clear that the purpose of the Carmack Amendment is "to remove the uncertainty surrounding a carrier's liability when

damage occurs to a shipper's interstate shipment." (Internal quotation marks omitted.) *Heniff Transportation Systems, L.L.C. v. Trimac Transportation Services, Inc.*, 847 F.3d 187, 190 (5th Cir. 2017). No such damage or liability was alleged here.

¶ 42     The Korunovskis' claim that Expedited was unable to maintain a suit because it no longer existed as a legal entity when this action was initiated is also wrong. The Korunovskis cite section 12.30(a) of the Business Corporation Act of 1983 for the proposition that "[d]issolution of a corporation terminates its corporate existence." 805 ILCS 5/12.30(a) (West 2018). While that is true, subsection (c) of the same section specifically provides that dissolution of a corporation "does *not* \*\*\* [p]revent suit by or against the corporation in its corporate name." (Emphasis added.) *Id.* § 12.30(c)(3). And as Expedited points out, the Business Corporation Act also has provisions explicitly noting that dissolution of a corporation "shall not take away nor impair any civil remedy to or against such corporation" (*id.* § 12.80) and providing that a corporation that is reinstated within three years of its dissolution "shall continue under its previous name without implicating its continuous legal status" (*id.* § 12.43). Not only did Expedited file suit within three years of its dissolution, but as Expedited points out in its brief, a review of the Illinois Secretary of State's website, which we may take judicial notice of (*Maldonado*, 296 Ill. App. 3d at 938), shows that Expedited indeed has been reinstated. See https://apps.ilsos.gov/corporatellc/CorporateLlcContro ller (last visited: June 24, 2021). It is clear that Expedited had the requisite legal status to bring suit against the Korunovskis.

¶ 43     The Korunovskis next argue that the trial court's judgment is void because Expedited failed to include two necessary parties: Nada and Skyway. "A necessary party is an individual or entity having a present, substantial interest in the matter being litigated, and in whose absence a complete resolution of a matter in controversy cannot be achieved without affecting that interest." *City of*

*Elgin v. Arch Insurance Co.*, 2015 IL App (2d) 150013, ¶ 34. A party is necessary if its presence is required to (1) "protect an interest in the controversy that would be materially affected by a judgment entered in its absence," (2) "protect the interests of those who are before the court," or (3) "enable the court to make a complete determination of the controversy." *Caparos*, 364 Ill. App. 3d at 175.

¶ 44    The Korunovskis argue that the trial court entered relief against Skyway though no claims were asserted against it. But as Expedited points out, the Korunovskis owned 100% of Skyway, and Dragan opened Skyway solely for the purpose of receiving his profit-share from Expedited. Expedited did not have a claim against Skyway. Expedited's claims were based on the Korunovskis' wrongful conduct. The distributions to Skyway were submitted as evidence to prove the Korunovskis' scheme. Skyway was not an indispensable party.

¶ 45    Nada was also not an indispensable party. The Nada argument is largely based on the contention that if Dragan owed anyone a fiduciary duty, it was only to Nada as his business partner and not to Expedited. But the trial court specifically found that Dragan owed a fiduciary duty to Expedited. The Korunovskis claim that this finding lacked support, but we disagree. The evidence was overwhelming that Dragan was an employee of Expedited who held himself out to be its vice president. As the trial court pointed out, it was unnecessary to resolve the parties' dispute as to whether Dragan had ever been appointed vice president since in Illinois, "[e]mployees as well as officers and directors owe a duty of loyalty to their employer[s]." *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 69. Dragan owed a fiduciary duty to Expedited.

¶ 46    The Korunovskis also argue that Nada was a necessary party because the trial court's judgments included compensation for debts that were personal to Nada. But the trial court specifically found that damages were based on debts owed by Expedited, some of which Nada

repaid on behalf of Expedited. These debts were damages suffered, in the first instance, by Expedited—even if Nada paid off some of those debts personally in her efforts to rescue the faltering company.

¶ 47    The Korunovskis next argue that the trial court erred in entering judgment against Katerina on count I for breach of fiduciary duty because she was not specifically named as a defendant in that count. The Korunovskis frame this argument as jurisdictional because, according to them, "[t]he trial court adjudicated an issue that was not pled." And it is true that "where no justiciable issue is presented to the court through proper pleadings, the court cannot adjudicate an issue *sua sponte*. Orders entered in the absence of a justiciable question properly presented to the court by the parties are void since they result from court action exceeding its jurisdiction." *Ligon v. Williams*, 264 Ill. App. 3d 701, 707 (1991). This jurisdictional bar does not apply in this case, however, where Expedited did plead breach of fiduciary duty in its complaint. Moreover, in entering judgment for Expedited, the trial court found the Korunovskis jointly and severally liable for all four counts and for punitive damages. "[A] judgment is to be construed like other written instruments with the determinative factor being the intention of the court as gathered from all parts of the judgment itself." *Fieldcrest Builders, Inc. v. Antonucci*, 311 Ill. App. 3d 597, 605 (1999). It is clear from the trial court's detailed written order that it found the Korunovskis worked together to commit the fraud against Expedited, and that Katerina was part of the conspiracy that allowed Dragan to breach his fiduciary duty to Expedited. The breach of fiduciary duty and conspiracy to commit fraud were plainly intertwined here. Indeed, Expedited incorporated by reference its allegations of breach of fiduciary duty in its claim for conspiracy. The trial court's finding that both Korunovskis were liable as to all four counts was not error.

¶ 48             2. The Evidence Fully Supported the Trial Court's Judgment

¶ 49    The Korunovskis' first sufficiency argument is that the trial court applied an incorrect standard regarding the burden of proof. As the Korunovskis point out, the claims of fraud and conspiracy based on circumstantial evidence must be proved by clear and convincing evidence. See *Los Amigos Supermarket, Inc. v. Metropolitan Bank and Trust Co.*, 306 Ill. App. 3d 115, 127 (1999) (fraud); *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999) (civil conspiracy based on circumstantial evidence). As we have recognized, "[c]lear and convincing evidence is *** more than a preponderance but less than is required to convict an individual of a criminal offense." *In re Tiffany W.*, 2012 IL App (1st) 102492-B.

¶ 50    The Korunovskis insist that the trial court employed a " 'but for' theory of recovery" rather than the clear and convincing standard. But the Korunovskis are comparing apples and oranges. The clear and convincing standard is a standard of proof whereas "but for" causation is one element of proximate causation. See *Turcios v. DeBruler Co.*, 2015 IL 117962, ¶ 23.

¶ 51    We have carefully reviewed the trial court's written order and it reflects the trial court's understanding of the correct standard of proof. For each claim, the court set out the applicable law, including the need for clear and convincing evidence of fraud, and discussed at length the support for its factual and legal conclusions. The court's consideration of but for causation does not contradict its demanding clear and convincing proof of Expedited's claims of fraud and civil conspiracy.

¶ 52    The Korunovskis next argue that the evidence presented at trial did not support the trial court's judgment. The Korunovskis highlight various evidentiary contradictions—such as the lack of charge backs shown on the JD Factors aging lists and the fact that Marija's e-mail to Mike Andrejco references 13 FedEx invoices while the complaint alleges 15 false FedEx invoices.

¶ 53    The trial court spent 35 pages detailing each of the claims alleged against the Korunovskis and the evidence that supported those claims. Marija testified that she investigated all the billing irregularities from JD Factors and found 15 false FedEx invoices, 25 CSX loads that were billed to both CSX and JD Factors, as well as other duplicate invoices. Marija testified from her considerable firsthand knowledge and understanding of Expedited's business operations, taking the trial court through each step of her investigation and the supporting documents she relied on, including invoices, aging lists, her own notes, and her e-mail exchange with Mr. Andrejco. Her testimony, corroborated in significant part by the documentary evidence and the testimony of Nada and Ashley, provided the trial court with a map of the Korunovskis' fraudulent activities. None of the relatively minor contradictions in the testimony or exhibits that the Korunovskis now focus on convinces us that Expedited failed to prove its claims of fraud, conspiracy, breach of fiduciary duty, and unjust enrichment against the Korunovskis.

¶ 54    Finally, the Korunovskis allege that the trial court improperly relied on pleadings and the parties' written closing arguments instead of exclusively on the evidence that was presented at trial. It is true that the trial court's written ruling cited extensively to Expedited's complaint and the parties' arguments. However, the court's analysis was also fully supported by the evidence that was presented at trial, which the court also referenced. In sum, nothing about the trial court's order leads us to believe that its rulings were not firmly grounded in the extensive evidence presented.

¶ 55    3. The Trial Court Did Not Abuse Its Discretion in Admitting Certain Exhibits

¶ 56    The Korunovskis contend that three specific exhibits were erroneously admitted into evidence and relied on by the trial court. A trial court has broad discretion in admitting evidence, and we review those rulings for an abuse of discretion. *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 2019 IL App 91st)172858, ¶ 31. This is "the most deferential standard of review,

and a trial court abuses its discretion only when its decision is unreasonable, arbitrary, or no reasonable person would take the view it adopted." *Id.*

¶ 57    The three challenged exhibits are (1) the JD Factors aging report for the FedEx invoices, (2) the aging report for the CSX invoices, and (3) a rate confirmation for the load of another customer, CH Robinson. The Korunovskis argue that these exhibits lacked foundation and were hearsay. Expedited responds that a proper foundation was laid for each exhibit under the business records hearsay exception. We agree with Expedited.

¶ 58    Illinois Supreme Court Rule 236(a) (eff. Aug. 1, 1992), governing the admission of business records into evidence, provides:

> "Any writing or record, *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter."

See also Ill. R. Evid. 803(6) (eff. April 26, 2012) (business record exception to the hearsay rule, similar in substance to Rule 236(a)).

¶ 59    A proper foundation for a business record requires the proponent of the evidence to show "that the record was kept in the ordinary course of business and that it was the regular practice of the business to make the record at that time." *Union Tank*, 2019 IL App (1st) 172858, ¶ 32. "Records made by a third party may be admissible as business records so long as the person authenticating the record was either their custodian or other person familiar with the business and its mode of operations." *Id.* The circumstances surrounding the creation of the record, including a lack of personal knowledge, go to the weight and not to the admissibility of the record. *Id.*

- 17 -

¶ 60    Here, the proper business records foundation was laid for these three documents. All three records were used in the regular course of business. Marija's testimony demonstrated her understanding and knowledge as to what the records were and how they were used. As to the aging lists, Dragan and Marija both testified that billing clerks relied on aging lists from the JD Factors website every day and in the regular course of their business to track which invoices had been paid to JD Factors by Expedited's customers and which had yet to be paid. Marija testified that the information on the aging lists was from the invoices Expedited would send to JD Factors.

¶ 61    With respect to the rate confirmation, Marija testified that it was a rate confirmation for Expedited's client, CH Robinson, and it that it was "what [Expedited] needed in order to invoice" certain loads. Marija testified that Expedited would receive a rate confirmation either physically or by e-mail from its dispatchers, and that a billing clerk like herself would enter it into the PCS software when creating an invoice for that load. Marija's testimony clearly established that the rate confirmation was a document used in the ordinary course of Expedited's business. There was no abuse of discretion in admitting these records.

¶ 62            4. The Award of Punitive Damages Was Not Improper

¶ 63    Finally, the Korunovskis argue that the trial court's award of punitive damages was improper as a matter of law. The purpose of punitive damages is "to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future." *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990). Although punitive damages are disfavored, they "may be awarded when torts are committed with fraud, actual malice, *** or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." (Internal quotation marks omitted.) *Id.* at 414-15.

¶ 64    Whether punitive damages are available as a matter of law is a question we review *de novo*.

*Gambino v. Boulevard Mortgage Corp.*, 298 Ill. App. 3d 21, 51 (2009). A finding by the trial court that the aggravating factors justifying the imposition of such damages has been adequately proven is accepted unless it is against the manifest weight of the evidence. *Id.* The ultimate question of whether an award of punitive damages was proper is reviewed for an abuse of discretion. *Id.*

¶ 65    Punitive damages were available as a matter of law in this case where Expedited proved its claims of fraud and breach of fiduciary duty. *Obermaier v. Obermaier*, 128 Ill. App. 3d 602, 610 (1984). Although the trial court noted that it had found in favor of Expedited on all four claims, including unjust enrichment, it made clear that its award of punitive damages was based only on the claims of fraud and breach of fiduciary duty, as an "appropriate means of punishing and deterring the [Korunovskis'] conduct." Furthermore, the court's necessary, although implied, conclusion that there were aggravating factors was not against the manifest weight of the evidence. The Korunovskis' scheme involved months of willful deception, the misappropriation of significant Expedited funds, and a serious breach of Nada's trust in them. The $100,000 in punitive damages was also significantly less than the $476,982.12 Expedited requested. Based on all the facts of the case, we cannot find that the court's award of punitive damages was an abuse of discretion.

¶ 66                              IV. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 68    Affirmed.