2023 IL App (1st) 221369-U

No. 1-22-1369

Order filed March 24, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN RE FORMER MARRIAGE OF, | ) | Appeal from the |
| JEFFREY JONES, | ) | Circuit Court of |
| | ) | Cook County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2015 D 7065 |
| | ) | |
| EMILY JONES, | ) | |
| | ) | Honorable |
| | ) | Lloyd James Brooks, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Delort and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The trial court did not err when it granted Respondent's petition for vaccination of minor child against COVID-19 and modified the parties' allocation of decision-making responsibilities because the evidence was not against the manifest weight; affirmed.

¶ 2    Petitioner Jeffrey Jones (Jeffrey) appeals from the trial court's order that granted Respondent Emily Jones's (Emily) petition for vaccination of minor child against COVID-19. In granting Emily's petition, the trial court modified the parties' final custody judgment such that she had sole decision-making authority only with respect to the minor child receiving the COVID-19 vaccination and any appropriate boosters. Jeffrey contends on appeal that the trial

court erred when it denied his motion for directed finding and that it also erred on a number of grounds when it granted Emily's petition for vaccination of the minor child and modified the parties' allocation of decision-making responsibilities. He argues, among other things, that the court's ruling was against the manifest weight of the evidence, and that it applied the incorrect standard under section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610.5(c) (West 2022)). For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       Emily and Jeffrey were married on October 20, 2009, and had one minor child, H.J., in March 2013. The parties' judgment of dissolution of marriage was entered on December 5, 2016, and it incorporated the Final Custody Judgment, which provided that substantial medical decisions were to be "resolved by the consensus of the parents." As for medical care, it stated, among other things, as follows:

> "Each parent shall at all times conduct himself or herself in a manner which promotes
>
> the cooperation and involvement of the other parent on any matters which concern the
>
> medical and health care of their child, keeping in mind that the cooperation and
>
> involvement of both parents on issues regarding medical and health care of their child is
>
> in the child's best interests."

¶ 5       Emily's Petition for Temporary Restraining Order and Preliminary Injunction

¶ 6       On December 14, 2021, Emily filed a petition for temporary restraining order and preliminary injunction, in which she asserted that Jeffrey intended to travel with H.J. to Costa Rica even though he refused to allow H.J. to get vaccinated against COVID-19. She asserted that a travel alert from the Center for Disease Control (CDC) had classified Costa Rica as a "level 4 warning" destination and advised individuals not to travel there. She contended that Jeffrey was

subjecting H.J. to dangerous conditions by taking him to Costa Rica while he was not vaccinated. Emily asserted that the matter was an emergency and requested a temporary restraining order and preliminarily injunction to prevent Jeffrey from traveling to Costa Rica with H.J. during the COVID-19 pandemic while H.J. was not vaccinated against the virus.

¶ 7    In the court's December 15, 2021, written order, it found that Emily's petition was not an emergency and concluded that it would not restrict Jeffrey from traveling to Costa Rica with H.J.

¶ 8    Emily's Petition for Vaccination of Minor Child Against COVID-19

¶ 9    On April 21, 2022, Emily filed the petition for vaccination of minor child against COVID-19 at issue here. Emily asserted that in October 2021, the United States Food and Drug Administration (FDA) authorized the COVID-19 vaccine for children ages 5 through 11, and that in November 2021, the CDC recommended that everyone over the age of 5 years old receive the COVID-19 vaccine. She also stated that H.J.'s healthcare providers recommended the vaccine. Emily requested Jeffrey to consent to H.J. receiving the COVID-19 vaccine, but he refused. She asserted Jeffrey was putting H.J.'s safety and well-being at risk and that his vaccination status was impeding his ability to socialize with his friends. The parties mediated the issue but could not reach an agreement. Emily requested the court grant her sole medical decision-making responsibilities for H.J. such that he could be vaccinated against COVID-19.

¶ 10    In response, Jeffrey argued that based on surveillance reporting in the United States, the risk of myocarditis after receiving the second dose of the mRNA-based COVID-19 vaccine was highest in adolescent and young men. To support his assertion, Jeffrey stated that he attached an article from the Journal of the American Medical Association (JAMA). We note that the record shows that the article attached to Jeffrey's response included only the first two pages

of a JAMA article entitled "Myocarditis Cases Reported After mRNA-Based COVID-19 Vaccination in the US From December 2020 to August 2021." Jeffrey argued that he was "taking extra precautions" regarding his decision on the COVID-19 vaccine. He stated that H.J.'s vaccination status had little impact on H.J.'s social life, noting that he had participated in Boy Scouts, Jiu Jitsu, a school field trip, a birthday party, a sleepover, and a family trip.

¶ 11        Hearing on Petition for Vaccination of Minor Child Against Covid-19

¶ 12        In June and July 2022, the trial court conducted a three-day hearing on the petition. Emily and Jeffrey were the only witnesses at the hearing.

¶ 13        Emily Jones

¶ 14        Emily testified that she was a general dentist, and that H.J. was nine years old at the time of hearing. In November 2021, all children five years and older became eligible for the COVID-19 vaccine, so H.J. became eligible. Jeffrey would not consent to the COVID-19 vaccination for H.J. The parties' final custody judgment required joint decision-making, so she needed Jeffrey's consent for H.J. to get the vaccine. Jeffrey had allowed H.J. to receive all other government recommended vaccines and Emily believed it was in H.J.'s best interest to get the COVID-19 vaccine.

¶ 15        Due to the COVID-19 pandemic, H.J. attended virtual school from home for some of first grade, second grade, and some parts of third grade. She testified that school from home had a "serious negative" effect on H.J., who was an only child and received a lot of his social interaction from school. Emily testified about various emails she received from school officials between January 2022 to June 2022, all of which were admitted into evidence. Emily identified an email sent from H.J.'s principal to all parents on January 1, 2022, which stated as follows:

"Families with unvaccinated students should pay careful attention to the Chicago Department of Public Health (CDPH) travel advisory guidance. Additionally, students who have been in close contact with someone who has tested positive for COVID-19 should get tested on Day 5 after exposure. Unvaccinated students must stay home and quarantine for 10 days from their last exposure, regardless of negative testing, while vaccinated students may attend school as long as they are not experiencing symptoms." (Emphasis in original.)

Emily testified that the email also stated that "research has also shown the most important thing to do for their health and safety is to get children vaccinated."

¶ 16       Emily identified a March 24, 2022, email from an academic interventionist at H.J.'s school sent to Emily and Jeffrey informing them that H.J. had been exposed to COVID-19 and that he would have to learn from home from March 25 to March 29, 2022. The letter stated that students who were fully vaccinated "may safely learn in person and do not require a shift to remote learning." The letter also stated that "[t]he best way to keep you and your child safe from COVID-19 is to get vaccinated." The court stated that to the extent the letter contained medical information, it would not accept it as evidence of the truth of the statement.

¶ 17       Emily identified three emails sent from school officials at H.J.'s school to Emily and Jeffrey in April 2022 regarding three different times that H.J. was exposed to COVID-19 and had to stay home from school as a result. Specifically, in the April 7, 2022, email, the assistant principal at H.J.'s school informed Emily and Jeffrey that H.J. would need to quarantine and stay home from school on Friday, April 8, 2022, and that he could return to school on Monday, April 11, 2022. During this period, H.J. did not have to miss school, as spring break was scheduled to start on April 8, 2022. In an email dated April 21, 2022, an academic interventionalist informed

Emily and Jeffrey that H.J. would need to stay home from school on Friday, April 22, 2022, and that he could return on Monday, April 25, 2022. In an email dated April 25, 2022, H.J's principal informed Emily and Jeffrey that H.J. had to quarantine and that he could return to school on Thursday, April 28, 2022. Emily testified that H.J. missed a total of about one week of in-person learning at school as a result of not being vaccinated.

¶ 18    Emily also identified a June 2, 2022, email from the school sent to Emily and Jeffrey informing them that H.J. had been exposed to COVID-19 and that the school had a new "Test to Stay" program. The letter explained that under the new program, unvaccinated children could return to school after being exposed to COVID-19 if they complete a test on day three, receive a negative test result, and self-report the result. The letter also informed the parents that the child would still have to wear a mask around others and could not participate in extracurricular activities or sport competitions for 10 days following exposure. Emily was concerned that the mask requirement would single H.J. out.

¶ 19    Emily testified that she worried that H.J. was not protected from the virus and could spread it to others and that she limited his interactions with others due to him being unvaccinated. H.J. could not attend some events due to his vaccination status, including a trip to the Museum of Science and Industry, a play date, and a birthday party. In January 2022, he could not go to restaurants or movies because he did not have a vaccination card. Other families wore masks when H.J. was around, and Emily did not have children in her home because she did not want to put them at risk. Emily was concerned with H.J. spending time with his grandparents while he was unvaccinated and, when H.J. had to quarantine at home due to exposure at school, his grandparents could not spend time with him. H.J.'s grandparents did not hug or kiss him as much as they did before COVID-19.

¶ 20        Emily identified a document from the CDC's website dated May 25, 2022, and entitled "COVID-19 Vaccine Recommendations for Children and Teens" (CDC recommendations),  which recommended that everyone H.J.'s age get vaccinated against COVID-19. Emily testified that, according to the CDC recommendations, the Pfizer-BioNTech vaccine was authorized for children 5 to 11 years old, but the Moderna and Johnson and Johnson vaccines were not recommended. The court admitted the exhibit, stating that it was from a "government-related website" and "the Court is permitted to take judicial notice of the information contained in this document."

¶ 21        Emily also identified an 11-page document from the Illinois Department of Public Health's (IDPH) website entitled "COVID-19 Vaccination for Young People" with the header "Frequently Asked Questions (FAQs)" (IDPH document). Jeffrey's counsel objected to the exhibit, stating that it was cumulative, a "voluminous publication," he could not "cross-examine pieces of paper," and the "prejudice is outweighing the probative value." Jeffrey's counsel also stated, "[w]e all know what the government said, that they recommend it." The court sustained the objection as cumulative, noting that the parties stipulated that "various government agencies have recommended vaccinations to a child the same age as [H.J]." Emily's counsel informed the court that he wanted to use the document to address an issue that Jeffrey had raised regarding myocarditis, after which the court stated it would permit the IDPH document limited to the issue of myocarditis and subject to any ability that Jeffrey might have to show that it was not an authentic government publication.

¶ 22        Emily's counsel then asked Emily about the IDPH document. Emily agreed with her counsel that under the "Frequently Asked Questions" section of the IDPH document, it stated

"Will the vaccine make children sick with myocarditis?" She agreed with counsel that the answer to the question stated as follows:

"Based on the latest evidence, the condition appears to be a rare side effect of the vaccine. Experts, including the American Academy of Pediatrics and CDC, continue to recommend COVID-19 vaccination for everyone five years of age and older because the known and potential benefits of COVID-19 vaccination outweigh the known and potential risks, including the possible risk of myocarditis and pericarditis."

Asked "what does that mean?" Emily responded "[t]hat although there may be a rare side effect, it's very rare. And the good of the vaccine outweighs the risk of a possible rare side effect." Emily further testified that according to the IDPH document, the risk of myocarditis applied to teenagers between the ages of 16 and 18. The court admitted the exhibit into evidence.

¶ 23        Emily next identified an FDA News Release entitled "FDA Authorizes Pfizer-BioNTech COVID-19 Vaccine for Emergency Use in Children 5 through 11 years of Age." Emily testified that under the section "Key Points for Parents and Caregivers," the document stated that the COVID-19 vaccination was 90.7% effective in preventing COVID-19 infections for children ages 5 through 11 and there were no serious side effects. Asked what the document said, "concerning the benefit versus the risk of the COVID-19 vaccination for children 5 years of age?" Emily responded, "[t]he benefits outweigh the known and potential risks for this age group." She testified that the document also stated that the risk of myocarditis was highest for males between the ages of 12 and 17. The court took judicial notice of the IDPH document, noting it was from the fda.gov website, and Jeffrey's counsel could argue about the weight the court should give the document.

¶ 24     On cross-examination, Emily acknowledged that, at the time of the hearing, the restrictions that were in place in January 2022 were no longer in effect, and H.J. was not restricted from going anywhere due to not having a proof of vaccination card. H.J. missed seven in-person school days, but he participated in virtual school on those days. H.J. received straight A's, and virtual learning did not impact his school performance. She agreed with Jeffrey's counsel that two of the vaccines that were previously recommended were no longer permitted for children in certain age groups. She testified that H.J. was more at risk for being unvaccinated than he would be if he received the vaccine. She testified that children generally had mild symptoms if they got COVID-19 but that they could also get very sick.

¶ 25                       Jeffrey's Motion for a Directed Finding

¶ 26     Following Emily's testimony, Jeffrey moved for a directed finding, which the court denied. In doing so, the court stated that it "looks to Section 610.5, [of the Act] which specifically speaks to the Court's ability to make modifications to the Allocation Judgment." The court then stated that "[u]nder 610.5(c), the Court merely needs to find, by a preponderance of the evidence, that the requested modification is in the best interests of the child." The court concluded that Emily "put forth sufficient evidence in the record that having the child be vaccinated may be in the child's best interest." The hearing then continued with Jeffrey's case-in-chief, in which Jeffrey testified and called Emily as an adverse witness.

¶ 27                               Jeffrey Jones

¶ 28     Jeffrey testified that H.J. was healthy and happy. H.J. was current with all immunizations other than the COVID-19 vaccination, which was the only medical care disagreement he had with Emily since the final custody judgment was entered in 2016. He testified that he had "a lot of concerns" with the COVID-19 vaccination and he knew co-workers

and family members who did not feel well for a few days after receiving the vaccination. He testified that there was "a mixture of medical opinions, research, guidance, often changing, often contradictory, side effects, reports of many people having adverse reactions," and he did not have any confidence in the "rapid development" of the vaccine. Through his own research, he learned about adverse reactions that some children in H.J.'s age group had experienced from the vaccine and that the long-term side effects were unknown. He testified there was "a lot of potential risk for a healthy child" to get the vaccine and he saw "no reason to apply this procedure to [H.J.] when there are so many unknown risks." Jeffrey testified that he felt that vaccines that were around for many years were safer than the COVID-19 vaccine, which was around for only a few years. He was also concerned that new COVID-19 strains could not be addressed by the current vaccine.

¶ 29      Jeffrey identified the article from JAMA that he referred to in his response to the petition as one of the articles he read in his research.[1] Following Emily's counsel's hearsay objection, the court stated it would not stop Jeffrey from "pointing out that he may have gotten some information from this article" and that it would allow Jeffrey to testify about the article to show what went into his decision-making. The court however stated it would not "pick out any information from this article and say that's true" and would not allow the exhibit into evidence because the author of the article was not testifying about it and Jeffrey was not an expert who could rely on the information. Jeffrey testified that the article "matched" his concerns regarding the potential impact the COVID-19 vaccine could have on a child in H.J.'s age group, including that the vaccine could cause myocarditis and severe heart failure.

---

[1] As previously noted, the record shows that only the first two pages of the JAMA article were included in Jeffrey's response to the petition. The full JAMA article is not included in the record on appeal.

¶ 30      Jeffrey testified that the CDC hosted a website entitled "Vaccine Adverse Event Reporting System" (VAERS), which contained reports regarding side effects and adverse reactions from vaccinations, including the COVID-19 vaccine. Jeffrey identified datasets that he downloaded from the VAERS website, including one entitled "VAERS 2022 – Reports for Boys aged 8-10." The court admitted the dataset into evidence with the instruction that it was "not taking any of the information contained within it for the truth of the matter." Jeffrey testified that his review of the dataset caused him concern about the safety of the vaccine, as there were reports of adverse reactions made to a government entity. He also identified a bar chart he downloaded from the VAERS website entitled "CDC VAERS (Vaccine Adverse Event Reporting System) Database 2018-2022." The court admitted the report "for what it's worth" but stated that Jeffrey could not testify about his interpretation of the data. Jeffrey testified that he reviewed the VAERS website for hours and it would keep him up at night. Jeffrey did not believe the COVID-19 vaccine was safe for H.J. If more testing and research was done, he would reconsider his decision.

¶ 31      Jeffrey identified a document entitled "Order from the Commissioner of Health of the City of Chicago" dated January 3, 2022, which set forth regulations regarding COVID-19 protocols in public places. He testified that this order did not have a big impact on H.J. He also identified a February 22, 2022, news release from the City of Chicago entitled "City to Remove Mask and Vaccine Requirements for Certain Public Settings on February 28 in Response to Continued Improvement in COVID-19 Metrics." He identified a document regarding the mask protocol at H.J.'s school that he received in March 2022, which provided that starting March 14, 2022, the Chicago Public Schools was moving to a mask optional model for students and staff. The court admitted these documents into evidence.

¶ 32      Jeffrey testified that H.J. had about seven days of remote learning due to him being exposed to COVID-19 at school. H.J. did very well with remote learning and was a straight A student. Jeffrey identified a calendar showing H.J.'s social activities in April 2022, including his Jiu-Jitsu lessons and Boy Scouts trips. H.J.'s vaccination status did not prohibit him from attending Jiu-Jitsu, Boy Scouts, family trips, a school field trip to the zoo, or sleepovers with his friends. He testified that H.J. had recently completed a Boy Scouts trip, which did not require proof of a COVID-19 vaccination, and was attending summer camp and meeting with friends on the weekends. H.J.'s vaccination status did not limit his social life while he was with Jeffrey nor his summer activities.

¶ 33      Jeffrey and Emily have cooperated in all other medical decisions other than the COVID-19 vaccination, including the decision for H.J. to have hernia surgery in 2019. Jeffrey and Emily researched the surgery, discussed the risks and benefits together, and attended physician consultations. He testified that Emily, as a practicing dentist, had medical knowledge he did not have, and he respected her opinions regarding H.J.'s health. As for Jeffrey's trip to Costa Rica, he investigated the risks before taking H.J. there, he did not have any indication it was a "hot spot" for COVID-19, and there were no travel restrictions based on vaccination status. It was beneficial for H.J. to travel to Costa Rica.

¶ 34      On cross-examination, Jeffrey testified that H.J.'s pediatrician recommended hernia surgery for H.J., and he read many articles about it. The risks with the surgery included infection or loss of potential nerve connectivity. He agreed that there were risks for all the vaccinations that H.J. had previously received and that no vaccine was 100% effective. He testified that the long-term side effects from getting a severe COVID-19 infection could include heart problems, heart failure, myocarditis, and skin rashes. He also testified that it was his understanding that

children experienced mild symptoms and recovered quickly from a COVID-19 infection. As for the Costa Rica trip, Jeffrey agreed that there was a travel advisory warning in an October 26, 2021, document issued by the U.S. Embassy in Costa Rica entitled, "Alert: New CDC Requirements for Entry to the United States Beginning November 8, 2021."

¶ 35                                    Emily Jones

¶ 36        Jeffrey called Emily as an adverse witness. She testified that H.J. missed a total of six in-person school days in March and April 2022. H.J.'s vaccination status caused her stress and anxiety and put her family and dental patients at risk. She believed some parents felt uncomfortable with H.J.'s vaccination status. According to an email from H.J.'s principal, about 90% of the students were vaccinated against COVID-19. In April 2022, Emily traveled by airplane with H.J. to North Carolina after he had been exposed to COVID-19 at school.

¶ 37        On cross-examination,[2] Emily testified that at all times when she traveled with H.J. to North Carolina, there were no warnings against traveling on airplanes, and she followed the government guidelines that were in effect at the time. Since the beginning of the COVID-19 pandemic, the school had changed its policies multiple times and they were subject to change in the future. She believed it was in H.J.'s best interest to get the COVID-19 vaccine. Emily's counsel attempted to introduce a June 8, 2022, letter from H.J.'s pediatrician regarding the COVID-19 vaccine, but the court sustained Jeffrey's counsel's objection based on it being inadmissible hearsay.

¶ 38        Trial Court's Ruling on Petition for Vaccination of Minor Child Against COVID-19

¶ 39        On August 8, 2022, the trial court granted Emily's petition. In the court's oral ruling, it noted that the parties disagreed on which standard applied. The court then concluded that

_____

[2] The court allowed Emily to combine her rebuttal testimony with her cross-examination in Jeffrey's case-in-chief.

"what the Court is being asked to do is to modify the current Allocation Judgment with respect to this particular decision" and "therefore, the Court is going to be applying the standards under 610.5 [of the Act], which permits the Court to make a modification upon a showing of a change in circumstances necessitating the modification regarding the best interests of the minor child." The court further concluded:

> "And so, with that being said, the Court certainly looked for an analysis of what is in the best interests of the minor child. So, the Court then looks to all of the factors under the statute as to what's in the best interests of the minor."
>
> The Court certainly believed that after listening to testimony on three separate days from both parents, that both parents have the child's best interest at heart, which always makes these decisions a little tougher.
>
> But it is not necessarily obvious that one parent is doing something out of spite or something along those lines. But I truly believe both parents believe that they've got their child's best interests at heart.
>
> Nonetheless, after considering all the factors and evidence that I heard on those three days, I do believe that it is in the minor child's best interests to receive the COVID-19 vaccine."

The court modified the allocation judgment such that Emily had sole decision-making authority only with respect to H.J. receiving the COVID-19 vaccination and any appropriate boosters. On the same day, the court issued a written order, in which it stated it found "by a preponderance of the evidence, after considering all testimony and relevant factors, that it is in the minor child's best interest that the minor child be vaccinated against Covid-19." It stated that pursuant to section 610.5 of the Act, the parties' final custody judgment was modified such that Emily "shall

14

have sole decision-making authority over the limited issue of the minor child being vaccinated against Covid-19, in accordance with government guidelines, and any booster vaccinations that may be appropriate, thereto."

¶ 40   The court subsequently granted Jeffrey's motion to stay the judgment. This appeal follows.

¶ 41                                II. ANALYSIS

¶ 42   On appeal, Jeffrey contends that the trial court erred when it failed to grant his motion for a directed finding. He also contends the court erred when it granted Emily's petition for vaccination of the minor child against COVID-19 on several grounds, including that the court's ruling was against the manifest weight of the evidence.

¶ 43                              Standard of Review

¶ 44   The trial court must allocate decision-making responsibilities according to the best interests of the child. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. "The trial court is in the best position to judge the credibility of the witnesses and determine the best interests of the child." *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24. This court will not reweigh evidence or assess the witnesses' credibility. *Jameson*, 2020 IL App (3d) 200048, ¶ 51. We will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Id.* ¶ 47. A trial court's decision is considered to be against the manifest weight of the evidence "only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.,* 2017 IL App (2d) 160657, ¶ 16. Under this standard, "the evidence will be reviewed in the light most favorable to the appellee" (*In re Marriage of Debra N. & Michael S.,* 2013 IL App (1st) 122145, ¶ 45), and we may "affirm the trial court's ruling if there is any basis in the record

15

to support the trial court's findings" (*In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24). "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Jameson*, 2020 IL App (3d) 200048, ¶ 50.

¶ 45        Section 610.5 of the Act sets forth the standards for modifying parenting time and judgments allocating parental decision-making responsibilities. 750 ILCS 5/610.5 (West 2022). Section 610.5(c), which is relevant here, states as follows:

> "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." 750 ILCS 5/610.5(c) (West 2022).

¶ 46        Accordingly, under the Act, the court may modify an allocation judgment if (1) a substantial change has occurred since the entry of the existing allocation judgment and (2) the modification is necessary to serve the child's best interests. *In re Marriage of Burns & Lifferth*, 2019 IL App (2d) 180715, ¶ 26. To determine a child's best interest for purposes of allocating significant decision-making responsibilities, the court must consider all relevant factors, including those set forth in section 602.5(c) of the Act. *Jameson*, 2020 IL App (3d) 200048, ¶ 47. The trial court need not make explicit findings as to each factor nor is it required to refer to every factor. *Id.*

¶ 47        Trial Court's Denial of Jeffrey's Motion for a Directed Finding

¶ 48        We first address Jeffrey's contention that the trial court erred when it denied his motion for a directed finding after Emily's case-in-chief because Emily did not meet her burden

of proving that it was necessary for H.J. to be vaccinated against COVID-19. There was a trial on the merits here, so the trial court's denial of Jeffrey's motion for a directed finding merged into the court's final judgment that granted Emily's petition and modified the final custody judgment. Thus, Jeffrey's claim that the court erred when it denied his motion for directed finding is not subject to review. See *Taylor v. Board of Education of the City of Chicago*, 2014 IL App (1st) 123744, ¶ 32 (concluding that, "as there has been a trial on the merits in this case, the denial of the Board's motions for summary judgment and direct verdict have merged into the final judgment"); *Wade v. Rich*, 249 Ill. App. 3d 581, 592 (1993) (where the court concluded that "a denial of a motion for summary judgment is not subject to review on appeal after a trial has been held, as any error in the denial merges into the subsequent judgment," it stated that "[t]his same reasoning applies equally to the plaintiff's issue on denial of his motion for a directed verdict as to liability"); *In re L.M.*, 205 Ill. App. 3d 497, 513 (1990) (where the court found that the father-respondent waived a challenge to the trial court's denial of a motion for judgment at the close of the State's case-in-chief because he produced evidence following the denial of that motion, the court noted, "[t]he obvious reason for that result is the trial court's ruling on the motion becomes merged into the judgment").

¶ 49          CDC Recommendations, IDPH Document, and FDA News Release

¶ 50          Jeffrey contends that the trial court improperly took judicial notice of three of Emily's exhibits, including the CDC recommendations, the IDPH document, and the FDA news release. He also claims the court abused its discretion when it admitted these exhibits into evidence.

¶ 51          This court has previously held that information on government websites is sufficiently reliable such that the court may take judicial notice of the information. *Leach v. Department of Employment Security*, 2020 IL App (1st) 190299, ¶ 44 ("Information on websites

17

and in public records are sufficiently reliable such that judicial notice may be taken."). Here, the trial court took judicial notice of the CDC recommendations, the IDPH document, and the FDA news release, all of which are from official government websites. Thus, the trial court properly took judicial notice of the information provided on these websites. See *Krewionek v. McKnight*, 2022 IL App (2d) 220078, ¶ 36 (where the court stated that it may take judicial notice of legal authority that recognized that COVID-19 vaccines were intended to prevent the contraction and transmission of COVID-19, it cited the CDC's website and explained that the website instructed that "COVID-19 vaccines are effective at preventing you from getting sick" and "Getting vaccinated is the best way to slow the spread of [COVID-19]"); *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 90 (where the defendant cited two articles from official governmental publications, including one article from the CDC, the court concluded that it could have taken judicial notice of the information had the information been presented in the trial court); *Edward Sims Jr. Trust v. Henry County Board of Review*, 2020 IL App (3d) 190397, ¶ 26 n.6 ("It is generally accepted that a court may take judicial notice of the information on a government website."); *Ashley v. Pierson,* 339 Ill. App. 3d 733, 739 (2003) (the court took judicial notice of information provided on the Illinois Department of Corrections website).

¶ 52     We next address Jeffrey's assertion that the court abused its discretion when it admitted these exhibits into evidence. "A trial court has broad discretion regarding the admission of evidence, and we will not disturb the court's ruling absent an abuse of discretion." *Union Tank Car Co. v. NuDevco Partners Holdings, LLC*, 2019 IL App (1st) 172858, ¶ 31. We will only reverse a trial court's decision if it is unreasonable, arbitrary, or no reasonable person would take the view adopted by the trial court. *Id.*

¶ 53        Jeffrey asserts that the court allowed Emily to testify as if she had expert knowledge of the three exhibits. However, the record does not show that the court allowed Emily to testify as if she was an expert. Rather, the record shows the court allowed her to recite certain parts of the information contained in the exhibits, of which, as previously discussed, the court properly took judicial notice. The court stated it was taking judicial notice of the information contained in the exhibits, not Emily's testimony about her interpretation of the information contained in the exhibits. Further, the court stated that it would allow Jeffrey to present evidence regarding the authenticity of and the weight the court should give the exhibits. Accordingly, from our review of the record, we cannot find the court abused its discretion when it admitted into evidence the CDC recommendations, the IDPH document, and the FDA news release.

¶ 54                    Trial Court's Judgment on Petition for Vaccination

¶ 55        Jeffrey contends that the trial court's ruling that granted Emily's petition for vaccination of the minor child against COVID-19 is against the manifest weight of the evidence. He argues that Emily failed to present sufficient evidence for the trial court to find that the COVID-19 vaccination was necessary to serve the best interests of H.J. He asserts that Emily presented only her own testimony and did not present an expert witness.

¶ 56        As previously discussed, the court may modify an allocation judgment if (1) a substantial change has occurred since the entry of the existing allocation judgment and (2) the modification is necessary to serve the child's best interests. *In re Marriage of Burns & Lifferth*, 2019 IL App (2d) 180715, ¶ 26. We will not disturb a trial court's ruling on the allocation of decision-making responsibilities unless that decision is against the manifest weight of the evidence. *Jameson*, 2020 IL App (3d) 200048, ¶ 47.

¶ 57       Here, Jeffrey does not dispute that the COVID-19 pandemic constituted a substantial

change in circumstances, as he asserts in his opening brief that, "[f]acts had arisen since the entry

of the Final Custody Judgment or were not anticipated therein, specifically the global Covid-19

pandemic" and the "introduction of a new vaccine for Covid-19 for the child was not

anticipated." Rather, Jeffrey argues that Emily failed to present evidence to show that the

COVID-19 vaccination was necessary to serve H.J.'s best interests.

¶ 58       Applying the principles discussed above, we find that the trial court's ruling that

granted Emily sole decision-making authority only with respect to H.J. receiving the COVID-19

vaccination is not against the manifest weight of the evidence. The trial court heard both parents

testify about the reasons that formed their decisions about the COVID-19 vaccination for H.J. as

well as about their disagreement regarding whether H.J.'s vaccination status impacted his

education and social experiences.

¶ 59       Emily testified that as a result of H.J.'s vaccination status, H.J. missed about one

week of in-person learning and that school from home had a "serious negative" effect on him, as

he received most of his social interaction from school. She testified that he also missed a play

date, a birthday party, and a trip to the Museum of Science and Industry. Emily was concerned

that H.J. was not protected from the virus as much as he could be and that he could spread it to

others. She testified that while H.J. was unvaccinated, she was concerned with him spending

time with his grandparents and limited his interactions with others. Emily also presented

documents from the government websites of the CDC, the IDPH, and the FDA, which all

recommended that everyone H.J.'s age be vaccinated against COVID-19. These documents

provide support for the trial court's ruling that granted Emily sole decision-making authority

over the COVID-19 vaccination. Accordingly, based on this evidence, the record supports the

trial court's ruling and we cannot find that an opposite conclusion is clearly apparent or that the decision is unreasonable, arbitrary, or not based on the evidence. Thus, the court's decision that granted Emily sole decision-making authority only with respect to the COVID-19 vaccination is not against the manifest weight of the evidence.

¶ 60     We acknowledge that Jeffrey testified that he was concerned about the long-term side effects of the vaccine, including that it could cause myocarditis and heart failure in children in H.J.'s age group. He testified that his concerns were based on a JAMA article, which was not admitted into evidence, and his review of datasets and reports of adverse reactions obtained from the VAERS website. Jeffrey also testified that H.J. did well very with remote learning, and that his social life while he was with Jeffrey was not limited. However, as a reviewing court, we may not reweigh the evidence, assess witness credibility, or set aside the trial court's decision simply because a different conclusion may have been drawn. See *Jameson*, 2020 IL App (3d) 200048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence.").

¶ 61     We note that Jeffrey asserts that Emily's evidence lacked expert testimony to support her contention that the vaccine was necessary and that if we affirm the trial court's ruling, our decision will set the precedent of granting medical decisions to a sole parent without the need for expert testimony. However, Jeffrey does not direct us to any authority that has held that when a court is determining whether a modification of a parties' allocation of decision-making responsibilities regarding a medical decision is necessary to serve the child's best interest, the movant must present an expert witness. Further, as previously discussed, the trial court properly

took judicial notice of the documents from the CDC, the IDPH, and the FDA, all of which recommended the vaccine for children in H.J.'s age group.

¶ 62          The Standard the Trial Court Applied and Best Interest Factors

¶ 63      Jeffrey contends that the court applied the incorrect standard under section 610.5 of the Act when it granted Emily's petition and modified the final custody judgment. He claims the court applied section 610.5(a), the section that addresses, in part, modifying parental time, rather than section 610.5(c), the section relevant here on modifying an order allocating decision-making responsibilities. In arguing that the court applied the section addressing modifying parenting time in section 610.5(a), Jeffrey cites the court's statement that it was "applying the standards under 610.5, which permits the Court to make a modification upon a showing of a change in circumstances necessitating the modification regarding the best interests of the minor child."

¶ 64      The part in section 610.5(a) that addresses modifying parenting time provides that "[p]arenting time may be modified at any time, without a showing of serious endangerment, upon a showing of changed circumstances that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2022). As previously discussed, under section 610.5(c) of the Act, which is relevant here, the court may modify an allocation judgment if (1) a substantial change has occurred since the entry of the existing allocation judgment and (2) the modification is necessary to serve the child's best interests. *In re Marriage of Burns & Lifferth*, 2019 IL App (2d) 180715, ¶ 26.

¶ 65      A trial court is "presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record." *In re N.B.,* 191 Ill. 2d 338, 345 (2000). Although the trial court did not recite the exact language from section 610.5(c) in its oral ruling, we cannot find that the record affirmatively shows that the trial court incorrectly applied section

610.5(c), or that it applied, as Jeffrey contends, the standard applicable to modifying parenting time set forth in section 610.5(a). Rather, when the court orally pronounced its ruling, it stated it was being asked to modify a current allocation judgment. The court's ruling then discussed whether the modification, *i.e.,* whether to grant Emily decision-making authority regarding the COVID-19 vaccine such that H.J. would receive the COVID-19 vaccine, was in H.J.'s best interests. Accordingly, we are unpersuaded by Jeffrey's argument that the court did not apply the correct standard when it granted Emily's petition for vaccination of H.J.

¶ 66       Jeffrey also claims that the court failed to mention the statutory best interest factors and did not provide a summary of the evidence as it relates to those factors. However, as previously stated, the court need not make an explicit finding on nor reference each factor. *In re Custody of G.L.,* 2017 IL App (1st) 163171, ¶ 43. Here, the court heard testimony and argument from both parties about H.J.'s best interests, and when it issued its oral ruling, it expressly stated that it considered the evidence and factors, as it stated, "after considering all the factors and evidence that I heard on those three days," it was in the minor child's best interests to receive the COVID-19 vaccine. It also stated that it "certainly looked for an analysis of what is in the best interests of the minor child" and that "the Court then looks to all of the factors under the statute as to what's in the best interests of the minor." Accordingly, the court stated that it looked to and considered the evidence and all the factors under the statute, and we presume the court followed the law, as the record does not affirmatively show that the court failed to do so. See *In re N.B.,* 191 Ill. 2d at 345 ("The circuit court is presumed to know the law and apply it properly, absent an affirmative showing to the contrary in the record.").

¶ 67                                    Due Process Argument

23

¶ 68      Jeffrey contends that the trial court's ruling infringed on his fundamental due process rights to make decisions concerning the care, custody, and control of his minor child. He argues that the trial court's errors in its interpretation and application of the law resulted in a violation of his procedural due process rights.[3]

¶ 69      "The federal and Illinois Constitutions protect persons from state governmental deprivations of life, liberty, or property without due process of law." *Village of Vernon Hills v. Heelan*, 2015 IL 118170, ¶ 31 (citing U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2). "Procedural due process concerns the constitutional adequacy of the specific procedures employed to deny a person's life, liberty, or property interests." *Id.* "Procedural due process generally refers to notice and the opportunity to be heard." *Fischetti v. Village of Schaumburg*, 2012 IL App (1st) 111008, ¶ 16. "Procedural due process rights include a right to present evidence and argument, a right to cross-examine witnesses, and impartiality in rulings upon the evidence which is offered." *Id.* We review *de novo* a claim that a party's procedural due process rights were violated. *In re Todd K.*, 371 Ill. App. 3d 539, 541 (2007).

¶ 70      Jeffrey asserts that his due process rights were violated because the court made numerous errors in its interpretation and application of the law and that it relied on improper evidence. However, our supreme court has stated that "procedural due process is not a guaranty against erroneous or unjust decisions, or the incorrect interpretation of statutes or rules of law" and "[n]either an abuse of discretion nor an erroneous rule of law will support a reversal for a deprivation of procedural due process." *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 246 (2006). Further, Jeffrey had the opportunity to present evidence and argument, to make

---

[3] We note that Jeffrey asserts in his reply brief that he was not required to send notice of his claim to the Illinois Office of Attorney General under Illinois Supreme Court Rule 19 (Ill. S. Ct. R. 19(a), (c) (eff. Sept. 1, 2006)) because he is "not challenging the constitutionality of any statute." He also asserts that although Rule 19 does not apply, he sent copies of the briefs filed in this case to the Office of the Attorney General, Civil Division.

objections, and to cross-examine witnesses. In addition, the court reviewed the evidence and arguments presented by the parties and then applied section 610.5 of the Act and, as previously discussed, the court's ruling is not against the manifest weight of the evidence. We also note that under section 602.5(a) of the Act, it states that "[n]othing in this Act requires that each parent be allocated decision-making responsibilities." 750 ILCS 5/602.5(a) (West 2022). Accordingly, the trial court's ruling that modified the parties' allocation of decision-making responsibilities and gave Emily sole decision-making authority only on the COVID-19 vaccination did not violate Jeffrey's due process rights.

¶ 71                                    III. CONCLUSION

¶ 72        For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 73        Affirmed.